**ASTRA PHARMACEUTICAL PROD-UCTS, INC., Plaintiff, Appellant,**

v.

**BECKMAN INSTRUMENTS, INC., Defendant, Appellee.**

No. 83–1300.

United States Court of Appeals, First Circuit.

Argued Sept. 14, 1983.

Decided Oct. 18, 1983.

David M. Lindley, New York City, with whom Dike, Bronstein, Roberts, Cushman & Pfund, Boston, Mass., Liddy, Sullivan, Galway & Vaccaro, and Hale Russell & Gray, New York City, were on brief, for plaintiff, appellant.

Frank P. Porcelli, Boston, Mass., with whom Wm. W. Rymer, John M. Skenyon, Fish & Richardson, Boston, Mass., and Robert R. Meads, Fullerton, Cal., were on brief, for defendant, appellee.

Before BOWNES, Circuit Judge, ALDRICH and SKELTON *, Senior Circuit Judges.

SKELTON, Senior Circuit Judge.

This is a trademark infringement case in which the appellant, Astra Pharmaceutical Products, Inc. (Astra), seeks to enjoin the appellee, Beckman Instruments, Inc. (Beckman), from using the mark "ASTRA" on its computerized blood analyzer machine and on various other products related to that machine. In addition, Astra also seeks relief from unfair competition, injury to property rights and business reputation, and trademark dilution under the Massachusetts Anti-Dilution Statute. The United States District Court for the District Court of Massachusetts, relying on the case of *Pignons S.A. de Mecanique v. Polaroid Corp.,* 657 F.2d 482 (1st Cir.1981), granted summary judgment in favor of Beckman on all counts, holding that there was no genuine issue of material fact. For the reasons stated below, we affirm.

* Of the Federal Circuit, sitting by designation.

## I. Background

Astra is a wholly-owned subsidiary of the Swedish corporation AB Astra, and is a manufacturer and distributor of pharmaceutical and medical products, the principal one being Xylocaine, a drug used as a local anesthetic and an anti-arrhythmic. Xylocaine sales represent the major portion (66%–70%) of Astra's overall sales income. Astra's products are distributed to such customers as hospitals, clinical laboratories, universities and other research institutions, retail drug stores, and dentists. In 1981, Astra's pharmaceutical sales to hospitals in the United States totalled approximately $27,000,000.

Astra is the owner of record of five active United States trademark registrations for the mark "ASTRA", or "ASTRA" with a star design, issued for pharmaceutical preparations and syringes. The syringes are prefilled with Xylocaine and are used for administering local anesthetics, or in giving cardiovascular treatments. Astra identifies all its products with its federally registered "ASTRA" mark and with its trade name, "Astra Pharmaceutical Products, Inc."

Beckman is a manufacturer and distributor of laboratory instrumentation and various other hospital and laboratory supplies and equipment. As a result of a recent merger, Beckman has become a wholly-owned subsidiary of the Smith-Kline Beckman Corporation. Beckman's worldwide sales of medical and scientific equipment are extensive, totalling $359,687,000 in 1980.

In 1977, Beckman developed a new computerized instrument which measures the quantities of various substances in the blood. This machine was developed chiefly for use in hospital laboratories to aid physicians in the diagnosis of disease by determining when the quantity of certain substances in the blood is abnormal. The Beckman analyzer uses "reagents," which are chemical solutions manufactured specifically for use in the machine, and which, when reacted with the blood, allow a technician to determine the quantity of certain

substances in the blood. The reagents are not drugs and are never administered to humans.

When Beckman developed this blood analyzer, it named the machine an "Automated Stat/Routine Analyzer," which indicates the machine's ability to switch automatically back and forth between performing routine blood tests and emergency ("stat") blood tests. The acronym "ASTRA" was formed from this full name. It is printed in block letters on the console of the analyzer and on the reagent packages. However, the full name of the machine is also printed in small letters under the "ASTRA" mark on all of the analyzers. The Beckman employee who first composed the "ASTRA" acronym testified without contradiction that at that time he had no knowledge of Astra's use of the mark. Since its introduction into the market, the analyzer has enjoyed great commercial success, with over 2000 of the machines being presently in use throughout the world. Beckman attributes much of this success to the "stat/routine" feature, which apparently is not present on other analyzers on the market.

Prior to adopting the "ASTRA" acronym for its analyzer, Beckman's counsel conducted a trademark search which revealed numerous uses of the word "ASTRA", but concluded that Beckman's use of the mark would not violate any rights in these marks or tradenames. Counsel for Astra notified Beckman on May 17, 1978, still prior to the first sale of an analyzer, that Beckman's use of the "ASTRA" mark would be an infringement and requested that Beckman not use the mark. Beckman proceeded with its plans to use the "ASTRA" mark, whereupon Astra filed this suit on July 23, 1979.

Astra's complaint contained seven counts, all concerning Beckman's use of the mark "ASTRA." The complaint alleged trademark infringement under common law and under the Lanham Act, 15 U.S.C. § 1114 *et seq.*, injury to property rights and business reputation, unfair competition, false designation of origin, and violation of the Massachusetts Anti-Dilution Statute, Mass.Gen. Laws c. 110B, § 12. Beckman denied any violation and, after discovery, moved for summary judgment, asserting that there was no genuine issue of material fact as to likelihood of confusion or trademark dilution. After a hearing on the motion was held, the District Court, on March 24, 1983, issued its Memorandum and Order granting summary judgment to Beckman on all counts of Astra's complaint. On May 24, 1983, the District Court issued a second order, declining to alter or amend its decision. Astra has appealed from these orders, which appeals were consolidated by order of this Court on June 1, 1983. Astra complains of error in the granting of the summary judgments, asserting that genuine issues of material fact exist concerning its claims.

## II. The Standard For Summary Judgment

The issue confronting this Court is whether the District Court erred in granting Beckman's motion for summary judgment. The standard for the granting of a summary judgment in a trademark infringement case in this circuit was clearly set out in the case of *Pignons S.A. de Mecanique v. Polaroid Corp., supra.* Summary judgment is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Pignons,* 657 F.2d at 486; Fed.R.Civ.P. 56(c). A factual dispute is material if it "affects the outcome of the litigation," and genuine if manifested by "substantial" evidence "going beyond the allegations of the complaint." *Pignons,* 657 F.2d at 486; *Hahn v. Sargent,* 523 F.2d 461, 464 (1st Cir.1975), *cert. denied,* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976). In passing on a summary judgment motion, the court must view the record and draw inferences in the light most favorable to the opposing party. *Pignons,* 657 F.2d at 486; *Hahn,* 523 F.2d at 464. With these axioms in mind, we now examine Astra's contentions.

### III. Trademark Infringement

As noted in the *Pignons* case, likelihood of confusion is "an essential element of a claim of trademark infringement," whether it arises under state or federal law. *Pignons*, 657 F.2d at 486–87. This Court in *Pignons* enumerated eight factors to be used as guides in assessing likelihood of confusion. Those factors are: (1) the similarity of the marks; (2) the similarity of the goods; (3) the relationship between the parties' channels of trade; (4) the relationship between the parties' advertising; (5) the classes of prospective purchasers; (6) evidence of actual confusion; (7) the defendant's intent in adopting its mark; and (8) the strength of the plaintiff's mark. *Pignons*, 657 F.2d at 487. Examining the evidence favorable to Astra as it applies to these factors, we must determine on the whole whether there is any genuine issue as to likelihood of confusion. No one factor is necessarily determinative, but each must be considered. *See Pignons*, 657 F.2d at 487–92. If, on the whole, no issue of fact concerning likelihood of confusion can be demonstrated, the District Court properly granted summary judgment on the infringement counts. We now consider the *Pignons* factors in the order named and as applied to the instant case.

*(1) The similarity of the marks.* It is clear that the word "ASTRA" is used by both parties to this suit as a trademark. In spelling and sound, therefore, the marks are identical. However, as we stated in *Pignons*, "similarity is determined on the basis of the total effect of the designation, rather than a comparison of individual features." *Pignons*, 657 F.2d at 487. As the District Court found, Beckman uses "ASTRA" as a brand name for its blood analyzer, while its house name, "BECKMAN," is clearly printed on another part of the machine, indicating Beckman as its source. On the other hand, Astra uses brand names such as "Xylocaine" to identify its products, while "Astra Pharmaceutical" and "ASTRA" are used as house names. In addition, as previously mentioned, the acronym "ASTRA" is accompanied by the words "Automatic Stat/Routine Analyzer" when it appears on a Beckman machine, further distinguishing the manner in which the parties use the mark.

It is well settled that under certain circumstances otherwise similar marks are not likely to be confused where used in conjunction with the clearly displayed name and/or logo of the manufacturer. *Pignons*, 657 F.2d at 487; *Fisher Stoves, Inc. v. All Nighter Stove Works, Inc.*, 626 F.2d 193, 194–95 (1st Cir.1980). This rule would seem to apply in this case, where the Beckman name is clearly visible on the analyzer. Nevertheless, in reviewing the granting of the summary judgment, we must consider the evidence in the light most favorable to the appellant. Under this standard, the presence of the word "ASTRA" on both Beckman and Astra products leads us to conclude that while the marks are not identical, they are at least similar for the purposes of the present review. However, this conclusion alone does not mandate a holding of likelihood of confusion, for all of the *Pignons* factors must be considered to determine if there is a genuine issue of material fact.

*(2) The similarity of the goods.* As counsel for Astra conceded in oral argument, this is not a confusion of goods case. The products involved in this case have few, if any, similarities. The Beckman analyzer is a massive instrument, weighing from 350 lbs. to 550 lbs., depending upon the model. It is used only in the chemistry laboratories of hospitals or research institutions, and is not employed to analyze or measure any of Astra's drugs. The Beckman analyzer costs between $35,000 and $60,000, and is a highly technical instrument. The reagents used by the machine are specially formulated for that purpose and are clearly labelled to that effect. They are not drugs and are never sold for human consumption.

Astra's products, on the other hand, consist mainly of local anesthetics, cardiovascular medicines, and prefilled syringes. It presently manufactures no laboratory instruments that are likely to be confused with the Beckman analyzer, and there is no

evidence that it intends to enter the laboratory instrument field. The most favorable inference that may be drawn from the evidence regarding the similarity of goods is that both parties' products are used in the medical or health care field. However, such a broad inference is not sufficient to demonstrate that a genuine issue exists concerning likelihood of confusion as to the source of the products involved in the present suit.

(3) *The relationship between the parties' channels of trade.*

(4) *The relationship between the parties' advertising.*

(5) *The classes of prospective purchasers.* As in the *Pignons* case, these three factors are interrelated and will be considered together here. Although the products in question are all used in hospitals, the evidence demonstrates very clearly that this is the most that can be said in Astra's favor on the issue of channels of trade. The decision to purchase Astra's products is made through the hospital pharmacy, as stated by Astra's own expert. The hospital pharmacy is basically autonomous in its purchasing procedures and is targeted by Astra in its advertising.

The Beckman analyzer, on the other hand, is marketed to the hospital chemistry lab. There is no evidence that the Beckman analyzer is ever advertised or marketed to hospital pharmacies, nor is there evidence that Astra products are advertised or marketed to hospital chemistry labs. In hospitals with separate purchasing departments, it is possible that the same purchasing agent may handle orders from both the pharmacy and the laboratory. But the purchasing agent merely fills out the necessary forms and arranges the shipping details. His involvement may at times extend as far as helping determine the best means of acquiring an analyzer, but there is no evidence from which it may be inferred that he is involved in the decision to purchase either Beckman or Astra products.

In addition, while both parties' products are advertised in hospitals through catalogs and journals, there is no evidence that the Beckman "ASTRA" analyzer is advertised in any publication in which Astra products are advertised. The catalogs and brochures distributed by the parties clearly indicate the sources of their advertised products, respectively.

■ Perhaps the most critical factor that weighs against Astra in our consideration of this issue is the sophistication of the class of prospective purchasers of the subject products. If likelihood of confusion exists, it must be based on the confusion of some relevant person; *i.e.,* a customer or purchaser. And there is always less likelihood of confusion where goods are expensive and purchased after careful consideration. *Pignons,* 657 F.2d at 489; *Fisher Stoves,* 626 F.2d at 194. The Beckman analyzer is sold only to hospital chemistry labs and never to the pharmacy or anyone who administers Astra drugs. The sales effort is directed to those normally in charge of the lab—the pathologist, the chemist, and the chief laboratory technologist. The Beckman salespeople are highly trained in order to be able to effectively deal with questions posed by the specialists in the lab. It takes from three months to a year to consummate the sale of a Beckman analyzer, involving an average of 55 hours of personal contact between lab personnel and sales representatives. The decision to buy a machine worth thousands of dollars is obviously not done on an impulse, and involves a careful consideration of the reliability and dependability of the manufacturer and seller of the product. Before an analyzer is shipped to a prospective purchaser, lab personnel are sent to a Beckman installation to be trained in the operation of the machine.

Similarly, Astra's salespersons are also highly trained in order to be able to communicate with the pharmacists and anesthesiologists who will be deciding whether or not to buy their products. These salespeople make it crystal clear who manufactures the drugs, as the hospital will always make a careful determination of the source of the drug before it will be listed on the hospital formulary. After all, these drugs may be used in life and death situations, and the

hospital, being in a position of trust, must be extremely cautious about what medicines it administers to its patients, as well as their source.

■ In short, it is simply inconceivable that purchasers of the parties' respective products could be confused as to the source of those products, or even about the relationship between Beckman and Astra as companies. Astra points to evidence showing that some companies sell both pharmaceutical and clinical products to hospitals, and invites us to infer from this that Beckman's use of the "ASTRA" mark might lead the hospital community to confuse the companies or to assume that a relationship exists between them. While we are to view the record in a light favorable to appellant, we are not required to ignore clear uncontradicted facts. The "hospital community" is not a homogeneous whole, but is composed of separate departments with diverse purchasing requirements, which, in effect, constitute different markets for the parties' respective products. The level of sophistication of the purchasers and the cost of the products is much higher here than it was in the *Pignons* case, and the overlap in markets is even less here than it was in *Pignons*. From our consideration of these factors, considered together, we can see no realistic likelihood of confusion of relevant purchasers.

*(6) Evidence of actual confusion.* As evidence of actual confusion, Astra relies on affidavits from three of its salesmen, William Sabin, Gary Rushing, and Gregory Harty. The Sabin affidavit stated that while Mr. Sabin was discussing Astra products with a Ms. Gloria Canzano, a buyer for Bon Secour Hospital in Methuen, Massachusetts, a Mr. Eugene Stabile, the Central Purchasing Director of the hospital, approached Mr. Sabin and stated, "We just got one of your machines." Beckman produced affidavits from both Ms. Canzano and Mr. Stabile which state that neither of them was ever confused about the sponsorship of the Beckman "ASTRA" analyzer. The affidavits do indicate, however, that Mr. Stabile did mistakenly assume that Mr.

Sabin was a Beckman salesman when he heard the word "Astra."

The Rushing affidavit states that Archie Nelson, Director of Purchasing for the Norfolk Community Hospital in Norfolk, Virginia, associated him with the Beckman analyzer. Beckman produced an affidavit from Mr. Nelson which states that he, in fact, was never confused about the origin of the machine.

Finally, Mr. Harty states that upon seeing his "ASTRA" badge, several lab technicians or nurses associated him with the Beckman analyzer. The most favorable inferences for Astra that can be drawn from these facts are that since the Beckman "ASTRA" analyzer was introduced on the market in 1978 two purchasing directors at separate hospitals and several lab technicians have mistakenly associated Astra salesmen with the Beckman analyzer because of the word "Astra." Thus, it could be inferred that at least temporary confusion about the salesmen of the companies occurred. However, there is no evidence whatsoever that anyone ever bought a Beckman analyzer thinking it came from Astra, or that anyone ever bought Astra products believing that they came from Beckman. There is no evidence that any temporary confusion that may have occurred regarding the identity of the salesmen had any effect whatever on the ultimate decision of a purchaser whether to buy a particular product. As noted previously, these products are bought by sophisticated purchasers only after careful consideration of the items being purchased, as well as their source.

■ In addition, any confusion has to exist in the mind of a relevant person. Lab technicians are not in that class, as no evidence has identified them as persons who are involved in decisions to buy. Indeed, purchasing directors themselves have only been shown to play a peripheral role in product choice. Therefore, from 1978 to 1982 there have been cited only two instances of actual confusion of relevant persons, if we assume them to be relevant, and such confusion was limited to the identity of salesmen. Neither case led to actual

confusion in purchasing the parties' products. We conclude that under these facts, any confusion which may have occurred was *de minimis,* and is not sufficient to raise a genuine issue of fact relating to the likelihood of confusion issue.[1]

 *(7) Beckman's intent in adopting the mark.* Beckman's stated purpose in adopting the "ASTRA" mark was to use it as an acronym for "Automated Stat/Routine Analyzer." There is no positive evidence that Beckman chose that name in bad faith or with an intent to deceive Astra or benefit from its reputation, as it did not discover Astra's use of it until after its trademark search. However, Astra argues that Beckman's adoption of the mark with knowledge that Astra was using it in the same product area requires the inference of bad faith. Our discussion under (2) above answers this contention. The products and markets are sufficiently dissimilar to allow both parties to use the mark without confusion. Astra's registered mark does not allow it to pre-empt the whole broad field of health care products, especially as to other goods in that field that are totally dissimilar to its products. *See Raxton Corp. v. Anania Assoc., Inc.,* 635 F.2d 924, 927–28 (1st Cir.1980). Therefore, no bad faith can be inferred from Beckman's use of the "ASTRA" mark on its unrelated product in the medical field.

Astra further contends that Beckman's intent to deceive and benefit from the trade reputation of Astra is presumed from Beckman's use of the Astra mark after protest had been made. In support of this contention Astra cites several authorities, among which are *Raxton Corp. v. Anania Assoc., Inc., supra; Tisch Hotels, Inc. v. Americana Inn, Inc.,* 350 F.2d 609 (7th Cir.1965); *Caesars World, Inc. v. Caesar's Palace,* 490 F.Supp. 818, (D.N.J.1980). All of the cited cases are factually distinguishable from the instant case and are not helpful in deciding the issue of bad faith here. *Raxton* involved the doctrine of "natural expansion" and held that while a prior user of a mark

could not monopolize areas their markets had never reached, it may be presumed that a subsequent user copied a prior user's mark if he knew of the prior user's activity in that area. However, the opinion also noted that this would not apply where the subsequent user uses the mark in good faith in territory in which the prior user's goods have not been sold. We have already discussed the fact that, while the goods of Astra and Beckman were in the same broad and general area of health care products, their qualities and functions were so dissimilar and the channels of trade so diverse as to prevent a likelihood of confusion as to source. Under these circumstances, we cannot presume bad faith on the part of Beckman when the undisputed evidence shows that it arrived at the mark independently and adopted it only after a careful trademark search.

The *Tisch Hotels* case involved a situation where the defendant adopted the identical mark for its hotels that the plaintiffs had first used for its hotels. The court found "incredible" the suggestion that defendant's mark was arrived at independently. Here, we do not have the same absolute identity of marks, products, markets or services that were present in *Tisch Hotels.* Therefore, the presumption of deliberate adoption made there is not appropriate here.

The *Caesar's Palace* case is similar to *Tisch Hotels.* The mark chosen by defendant soon after plaintiff opened its business was identical to plaintiff's mark. In our case, while the marks in their totalities are similar, they are not identical, and the undisputed evidence is that Beckman first decided upon the acronym "ASTRA" before discovering Astra's use of it.

In sum, we hold that in the instant case where the goods and channels of trade in question are dissimilar, the level of sophistication of purchasers is high, and the initial choice of a mark is arrived at independently, bad faith will not be presumed on the part of Beckman.

---

1. We note that in the case of *Scott Paper Co. v. Scott's Liquid Gold, Inc.,* 589 F.2d 1225, 1231 (3rd Cir.1978), nineteen misdirected letters in four years sent to the wrong company by consumers were not considered sufficient evidence of actual confusion to establish likelihood of confusion in the marketplace.

*(8) The strength of Astra's mark.* The evidence favorable to Astra on this point tends to suggest that for summary judgment purposes its mark may be considered relatively strong in the medical field. While the record shows that there are over 100 trademark entries for "ASTRA," only 49 were for active registered marks. Of these, only 5 were for health care products, all of which belonged to Astra or its Swedish parent. Therefore, Astra's mark can be considered to have a certain degree of strength. But this is of little help to Astra in view of the dissimilarity of the goods, the diverse channels of trade, the differences in the markets and the sophistication of the purchasers.

Having carefully considered the factors enumerated in *Pignons* relating to the issue of likelihood of confusion, as applied to the instant case, we hold that, on the whole, no genuine issue as to the likelihood of confusion has been shown, and that the judgment of the District Court granting Beckman's motion for summary judgment on Astra's federal and common law trademark infringement case is affirmed.

### IV. Unfair Competition and Injury to Business Reputation

The *Pignons* case makes it clear that a plaintiff must support a charge of unfair competition with a showing of likelihood of confusion. *Pignons,* 657 F.2d at 493. As the District Court found, in the absence of likelihood of confusion between the source of Astra's Pharmaceuticals and that of the Beckman analyzers, there is no unfair competition nor injury to Astra's business reputation. Therefore, our holding that there is no likelihood of confusion in Astra's trademark infringement complaint is fatal to its unfair competition and business reputation claims, as well, and the District Court's decision in this regard is affirmed.

### V. Trademark Dilution and Injury to Property Rights

Because the District Court and the parties have treated these subjects under the same standard, we will consider them together. Mass.Gen.Laws c. 110B, § 12 provides:

> Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark registered under this chapter, or a mark valid at common law, shall be a ground for injunctive relief notwithstanding the absence of competition between the parties or the absence of confusion as to the source of the goods or services.

As we held in *Pignons,* to obtain relief under this statute, the plaintiff must show (1) that its mark is distinctive, and (2) that the defendant's use of a similar mark has created the likelihood of dilution. *Pignons,* 657 F.2d at 493–94. We will assume, without deciding, that Astra's mark is distinctive and proceed to consider the likelihood of dilution. In order to raise a fact issue on likelihood of dilution, Astra must produce sufficient evidence to support a finding of either (a) injury to the value of the mark caused by actual or potential customer confusion, (b) injury resulting from use of the mark in a way that detracts from, draws on, or otherwise appropriates the goodwill and reputation associated with plaintiff's mark, or (3) diminution in the uniqueness and individuality of plaintiff's mark. We have already determined that the evidence does not raise a fact issue as to customer confusion, which eliminates (a).

In regard to appropriating another's goodwill, the *Pignons* Court noted that the use of a uniquely identifying tradename can be an adequate remedy for dilution. *Pignons,* 657 F.2d at 495. The Beckman name is printed in full view on its analyzers, and the full name of the analyzer is printed under the "ASTRA" mark. In addition, as pointed out above, during the long hours of sales negotiation and buyer education involved in the purchase of a Beckman analyzer it will be made abundantly clear that Beckman, not Astra, is the source of the product. This, in conjunction with the extremely discriminating nature of those who purchase the product, makes the appropriation of Astra's goodwill and reputation by Beckman a virtual impossibility.

Finally, Astra argues that even though there are over 100 registrations of the mark "ASTRA," its mark is unique and individual in the medical field and this uniqueness will suffer from Beckman's use of the mark. It contends that the other registrations have not already diluted its mark because they are in unrelated fields. We have already noted that, while the Beckman analyzer and Astra products may be in the same broad health care field, there is sufficient dissimilarity to prevent confusion. For the same reasons, there is sufficient dissimilarity to prevent dilution. If the other registrations and uses of the "ASTRA" mark have not already diminished the uniqueness of Astra's mark, Beckman's use of it on its analyzer will not diminish it, either. Therefore, we hold that no genuine issue of material fact has been raised relating to trademark dilution.

In conclusion, after carefully considering the briefs, the oral arguments and all of the parties' contentions, we hold that there is no genuine issue of material fact that would warrant reversal of the District Court's decision. Accordingly, the judgment of the District Court is affirmed.

*Affirmed.*