**ELECTRONIC DESIGN & SALES, INC., d/b/a E.D.S., Engineering Design & Sales, Electronic Design and Sales, Inc., Appellant,**

v.

**ELECTRONIC DATA SYSTEMS CORPORATION, Appellee.**

**No. 91–1100.**

United States Court of Appeals, Federal Circuit.

Jan. 8, 1992.

Rehearing Denied Feb. 4, 1992.

Suggestion for Rehearing En Banc Declined Feb. 20, 1992.

---

**714**

Susan Freya Olive, Olive & Olive, P.A., Durham, N.C., argued, for appellant.

Martin Faier, of Chicago, Ill., argued, for appellee. With him on the brief were James M. Faier and Melinda Faier.

Before NIES, Chief Judge, ARCHER and MICHEL, Circuit Judges.

MICHEL, Circuit Judge.

Electronic Design & Sales, Inc. ("Electronic Design" or "applicant") appeals the decision of the United States Patent and Trademark Office, Trademark Trial and Appeal Board ("Board"), sustaining Electronic Data Systems Corporation's ("Electronic Data" or "opposer") opposition and denying Electronic Design's application Serial No. 680,741 for registration of the block letter trademark "E.D.S." enclosed in a stylized box. *Electronic Data Systems Corp. v. Electronic Design & Sales, Inc.,* Opposition No. 77,738 (TTAB Sept. 5, 1990). The Board concluded that purchasers and users of Electronic Data's computer services sold under the service mark "EDS" who saw applicant's power supplies or battery chargers with the above trademark would likely be confused and believe that applicant's equipment is produced or endorsed by Electronic Data. We hold that the Board failed to assess properly the differences in purchasers, channels of trade, and what each company sold, and overlooked the sophistication of the purchasers; that the Board accorded too much weight to the renown and strength of Electronic Data's mark; and that the Board's legal analysis was deficient. Because the Board's conclusion of a likelihood of confusion among relevant persons was incorrect as a matter of law, we reverse.

## BACKGROUND

In opposing the application of Electronic Design, Electronic Data asserted prior use and registration of the *service mark* "EDS" (Registration No. 952,895, issued Feb. 6, 1973) for computer programming services including the design, implementation and management of electronic data processing programs and telecommunications services. Opposer also plans or arranges the installation of computer hardware and software as part of its overall computer services. Whereas in the past, opposer leased and sold computer equipment it made, it currently sells and leases only equipment made by others bearing the names and marks of those manufacturers.[1]

---

1. While opposer introduced registrations covering a composite mark with the letters EDS for

computer hardware, it relied entirely upon its use and registration of EDS as a service mark.

Opposer sells its computer services to customers in the medical, automotive, merchandising, communications and other fields. Its customers are mostly large corporations such as Blue Cross and Blue Shield, General Motors, Sears, Roebuck & Co., and International Business Machines.

Applicant, by contrast, started operations as a sole proprietorship in the fall of 1976, performing custom contract work for others by designing power supplies under the *trademark* "EDS." Since 1982, applicant has made and sold its own battery chargers and power supplies with the mark contained in its registration application.

Applicant sells ten to fifteen percent of its goods directly to individuals through retail electronic stores and mass merchandisers. The majority of its sales, however, consist of large original equipment manufacturer ("OEM") sales in which applicant's goods are sold to other manufacturers who incorporate the products into their own electronic devices, which are then sold under the other manufacturers' marks. Approximately forty percent of applicant's OEM power supplies are incorporated into medical instruments and devices. Like opposer, applicant sells to customers in the automotive, merchandising and communications fields. Specifically, both parties sell to General Motors and Sears. However, the parties advertise in different media and exhibit at different trade shows.

Opposer relied on the deposition testimony from employees of various third parties who were aware of opposer and its services and who testified to its previous use of the mark "EDS" on its own computer hardware, particularly terminals. Opposer also introduced deposition testimony and exhibits regarding the amount of its sales and the extent of its advertising: Revenues in recent years were in the billions of dollars, while advertising expenses exceeded $40 million in 1989 alone.

Upon consideration of the record as a whole, the Board concluded that applicant's power supply goods and opposer's computer services are sufficiently related and would likely be encountered by the same persons so that confusion is likely, especially in view of the near identity of the parties' respective marks and the renown and strength of opposer's mark. *Electronic Data*, slip op. at 7.

On appeal, applicant broadly challenges the Board's holding that there is a likelihood of confusion. We have jurisdiction over the appeal pursuant to 28 U.S.C. § 1295(a)(4)(B) (1988) (jurisdiction over all Trademark Trial and Appeal Board final decisions).

## DISCUSSION

We need only address one issue: whether the Board's conclusion that likelihood of confusion was proven is correct. Because we conclude that likelihood of confusion was not established, we do not reach the issues of laches or estoppel which applicant asserted below as equitable defenses and again argues here.

■ While we review the underlying factual findings by the Board for clear error, *Weiss Assocs., Inc. v. HRL Assocs., Inc.*, 902 F.2d 1546, 1548, 14 USPQ2d 1840, 1841 (Fed.Cir.1990), the ultimate issue of likelihood of confusion is a question of law which we review *de novo*. *Id.* at 1548, 14 USPQ2d at 1842; *In re Bed & Breakfast Registry*, 791 F.2d 157, 158, 229 USPQ 818, 818–19 (Fed.Cir.1986) (Likelihood of confusion, on appeal from the Board, is reviewed for correctness as a matter of law.).

### I

In determining likelihood of confusion, the Board relied heavily on the relatedness of the goods and services. *Electronic Data*, slip op. at 7. The Board's conclusion, that applicant's "goods are *sufficiently related* [to opposer's services] and would likely be encountered by *some of the same persons* so that confusion is likely," id. (emphasis added), incorporated doubtful fact findings concerning the relatedness of the goods and the services and, in any event, is incorrect as a matter of law.

15 U.S.C. § 1052 currently provides that an applicant's trademark shall not be refused registration

unless it consists of or comprises a mark which so resembles a mark registered in the Patent and Trademark Office, or a mark or trade name previously used in the United States by another and not abandoned, as to be likely, when used on or in connection with the goods of the applicant, to cause confusion, or to cause mistake, or to deceive. . . .

15 U.S.C. § 1052(d) (1988). Originally, this section of the statute expressly limited consideration of possible confusion to purchasers. In amending section 1052 of Title 15 of the United States Code to its current version, Congress deleted the term "purchasers." *See* S.Rep. No. 2107, 87th Cong., 2d Sess. 4, *reprinted in* 1962 U.S.C.C.A.N. 2844, 2847. The legislative history states that the word "purchasers" was deleted because "the provision actually relates to potential purchasers as well as to actual purchasers." Id. Therefore, we do not construe this deletion to suggest, much less compel, that purchaser confusion is no longer the primary focus of the inquiry. Instead, we believe that, at least in the case of goods and services that are sold, the inquiry generally will turn on whether actual or potential "purchasers" are confused. As set forth in the First Circuit's post-amendment decision in *Astra Pharmaceutical Prods. v. Beckman Instruments*, 718 F.2d 1201, 1206, 220 USPQ 786, 790 (1st Cir.1983): "If likelihood of confusion exists, it must be based on the confusion of some relevant person; *i.e.,* a customer or purchaser." *See also Ferrari S.P.A. Esercizio Fabriche Automobili E Corse v. Roberts*, 944 F.2d 1235, 1245, 20 USPQ2d 1001, 1010 (6th Cir.1991) (Relevant persons include *subsequent* purchasers even when the *initial* purchaser was informed of the actual source.).

For determining likelihood of confusion, however, "relevant persons" is not always limited to purchasers, past or future. For some owners of marks, such as the American Red Cross with its well-known mark, there are no purchasers. In these instances, "relevant persons" would encompass all who might know of their services and then become purchasers of goods or services of others. In this case, however, we are concerned only with goods and services that are sold. So here, our concern is directed primarily toward the likelihood of confusion among actual and potential purchasers. The essential inquiry in this appeal then is whether there is likely to be sufficient overlap of the respective purchasers of the parties' goods and services to confuse actual and potential purchasers.

In *Astra*, the parties marketed and sold goods marked with the name "ASTRA" to the same purchasing institutions—large hospitals. 718 F.2d at 1206, 220 USPQ at 790. Although both parties manufactured goods "in the same broad health care field," *id.* at 1210, 220 USPQ at 793, Astra sold pharmaceutical products to hospital pharmacies and Beckman sold laboratory instrumentation to hospital laboratories. *Id.* at 1206, 220 USPQ at 790. In affirming a grant of summary judgment of no infringement, the court held that use in the same broad field "is not sufficient to demonstrate that a genuine issue exists concerning likelihood of confusion." *Id.,* at 1206, 220 USPQ at 790. The First Circuit's holding recognized that "[t]he 'hospital community' is not a homogenous whole, but is composed of separate departments with diverse purchasing requirements, which, in effect, constitute different markets for the parties' respective products." *Id.* at 1207, 220 USPQ at 791. Because a common purchasing agent for several autonomous departments "merely fills out the necessary forms and arranges the shipping details," *id.* at 1206, 220 USPQ at 790, even when there is an overlap in purchasing persons due to a common purchasing agent, such an agent is not necessarily a "relevant person" for determining likelihood of confusion.

Similarly, in the instant case, where both applicant's goods and opposer's services are marketed and sold in the medical and certain other fields, it is error to deny registration simply because "applicant sells some of its goods in some of the *same fields* in which opposer provides its servic-

es," *Electronic Data,* slip op. at 6 (emphasis added), without determining who are the "relevant persons" within each corporate customer. This is especially true where, as here, the Board acknowledged that "applicant's goods are specifically different and noncompetitive." *Id.*

■ Thus, although the two parties conduct business not only in the same fields but also with some of the same companies, the mere purchase of the goods and services of both parties by the same institution does not, by itself, establish similarity of trade channels or overlap of customers. *Astra,* 718 F.2d at 1206, 220 USPQ at 790. The likelihood of confusion must be shown to exist not in a purchasing *institution,* but in "a customer or purchaser." *Id.,* at 1206, 220 USPQ at 790. As one of our predecessor courts, the Court of Customs and Patent Appeals, stated in *Witco Chem. Co. v. Whitfield Chem. Co.,* 418 F.2d 1403, 1405, 164 USPQ 43, 44–45 (CCPA 1969), *aff'g,* 153 USPQ 412 (TTAB 1967):

> We are not concerned with mere theoretical possibilities of confusion, deception, or mistake or with de minimis situations but with the practicalities of the commercial world, with which the trademark laws deal.

■ Although opposer's services and applicant's goods are purchased by some of the same large *corporations,* the individual departments therein may be as independent in their purchasing activities as were the hospital departments in *Astra.* In such corporations, it cannot be presumed, as the Board apparently did, that the general computer services are selected by the same individuals who select battery chargers and power supplies. There is no evidence here, for example, that those computer specialists in the administrative departments at General Motors responsible for purchasing computer services are also responsible for purchasing battery chargers for the auto parts and services departments. That persons in charge of such purchasing cannot be presumed to be the same as between opposer and applicant is further borne out by the fact that they advertise in completely different media and exhibit at different trade shows. Therefore, the Board's finding that the goods "would likely be encountered by some of the same [relevant] persons," *Electronic Data,* slip op. at 7, while true, does not establish that the actual and potential purchasers from each party would be the same, due to specialization among their corporate customers' departments.

The tenuous connection between applicant's and opposer's trade channels becomes clearer when one considers the uses of their respective marks within the medical field. Opposer supplies data processing services for medical insurers, whereas applicant sells batteries and power supplies to makers of medical equipment such as bedside alert systems and crib monitors. As to which persons might be confused, or would even see both marks in connection with these goods and services, opposer suggests that when a medical device fitted with one of applicant's power supplies malfunctions and the unit is opened to reveal applicant's mark ("E.D.S." in a stylized box), opposer's reputation is damaged by the negative context in which applicant's mark appears. However, opposer offers no reason to infer, for example, that Blue Cross officials responsible for purchasing its computer services might decide to discontinue purchasing from opposer because of confusion by a secretary in a physician's office who mistakenly attributes the malfunction to opposer, even though the secretary will process patients' claims to Blue Cross. Indeed, it seems clear such officials would not even become aware of the secretary's confusion. Therefore, the secretary cannot be a relevant person. Nor, for the same reason, can the physician or nurse. None of them ordinarily would have any involvement in Blue Cross's purchase of computer services. *Accord Astra,* 718 F.2d at 1207, 220 USPQ at 791 ("[A]ny confusion has to exist in the mind of a relevant person.").

Because the Board only considered corporate customers as a whole rather than determining the "relevant persons" within, its analysis was legally deficient. The Board's concern that opposer's customers "who come into contact with" applicant's

goods "may well believe that applicant's goods are produced or sponsored by opposer," *Electronic Data,* slip op. at 7, is unwarranted because it would involve at most only a *de minimis* number of sophisticated purchasers. In other words, any overlap in customers is too small to be significant much less dispositive.

While the Board also referred to "users," *Electronic Data,* slip op. at 7, not all "users" are necessarily "relevant persons" within the meaning of the statute and the case law. We broadly construe purchasers and potential purchasers to include those persons, such as some users, who might influence future purchasers. For commercially sold items, only those users who might influence future purchasers can be considered "relevant persons." Even as to those users who might be relevant persons, however, the Board's analysis failed to identify any involvement with purchases and therefore was deficient. Therefore, a separate analysis with respect to mere users is not required here.

## II

The Board also apparently failed to consider, and certainly failed to address, the sophistication of the buyers. "In every case turning on likelihood of confusion, it is the duty of the examiner, the board and this court to find, upon consideration of *all* the evidence, whether or not confusion appears likely." *In re E.I. DuPont DeNemours & Co.,* 476 F.2d 1357, 1362, 177 USPQ 563, 568 (CCPA 1973) (emphasis in original). Even though the Board made explicit factual findings as to five of the thirteen factors set forth in *DuPont,* 476 F.2d at 1361, 177 USPQ at 567, the Board gave too much weight to certain *DuPont* factors, such as the strength of opposer's mark, and failed to give due weight to countervailing *DuPont* factors, such as the sophistication of purchasers. Even assuming, *arguendo,* that the Board was correct in finding sufficient relatedness of the goods and services, the relevant persons— potential or actual purchasers—are never-

theless mostly different and in any event are sophisticated enough that the likelihood of confusion remains remote.

In an analogous case, *Dynamics Research Corp. v. Langenau Mfg. Co.,* 704 F.2d 1575, 217 USPQ 649 (Fed.Cir.1983), our court affirmed the Board's conclusion that "because the marks are used on goods that are 'quite different' and sold to different, *discriminating customers,* there is no likelihood of confusion" even though both parties used the identical mark "DRC." [2] *Id.* at 1576, 217 USPQ at 649 (emphasis added). Where the purchasers are the same, their sophistication is important and often dispositive because "[s]ophisticated consumers may be expected to exercise greater care." *Pignons S.A. de Mecanique de Precision v. Polaroid Corp.,* 657 F.2d 482, 489, 212 USPQ 246, 252 (1st Cir. 1981). "[T]here is always less likelihood of confusion where goods are expensive and purchased after careful consideration." *Astra,* 718 F.2d at 1206, 220 USPQ at 790.

Just from the record description of goods and services here one would expect that nearly all of opposer's and applicant's purchasers would be highly sophisticated. Nothing in the record is to the contrary. Indeed, the record confirms that opposer's services are expensive and are purchased *only* by experienced corporate officials after significant study and contractual negotiation. Applicant submitted deposition testimony from three experienced purchasers of battery chargers and power supplies in the OEM market which demonstrates that the evaluation process used in selecting applicant's products requires significant knowledge and scrutiny. Thus, it is evident that both opposer's services and applicant's goods are usually purchased after careful consideration by persons who are highly knowledgeable about the goods or services and their source.

While nearly all purchasers from opposer are sophisticated, some of applicant's might not be. However, while the record establishes that ten to fifteen percent of applicant's goods are sold through retail con-

---

**2.** The near identity of the marks here is apparent and is not seriously disputed. But it too was given excessive weight by the Board in light of the sophistication of purchasers here.

sumer channels, the Board's conclusion of likelihood of confusion is unwarranted even as to these purchasers because there is no evidence of overlap with purchasers of opposer's services. Nor has it been demonstrated in the record that users of opposer's computer terminals who buy applicant's goods at retail influence actual or potential purchasers of opposer's computer services.

Finally, opposer urges the likelihood that persons who use opposer's data processing and telecommunications services at work and who buy batteries at retail stores would be confused as to source. The extension of "relevant persons" to this group is untenable in this case. First, it has not been shown that such persons would even be aware of who provided the data processing services to their employer. Second, the potential for confusion appears a mere possibility not a probability. *See Carter–Wallace, Inc. v. Procter & Gamble Co.*, 434 F.2d 794, 804, 167 USPQ 713, 720 (9th Cir.1970). And third, the number of persons in this possible category appears at best *de minimis.*

In sum, since the parties' respective purchasers and potential purchasers are substantially different, are usually sophisticated, and operate independent of mere users of opposer's discontinued line of computer terminals, and since applicant's equipment and opposer's services are different, under a proper analysis of the *Du-Pont* factors, likelihood of confusion for relevant persons has not been established, even among retail customers. Moreover, the Board's emphasis on the strength of opposer's service mark is erroneous since opposer's sales and advertising data of record do not establish opposer's fame in fields other than corporate computer services, and, in any event, would not carry over to goods that "are specifically different and noncompetitive." *Electronic Data*, slip op. at 6. Therefore, the Board's

conclusion of likelihood of confusion cannot be upheld.

## III

In enacting the trademark laws, Congress clearly intended to protect the reputation of manufacturers and to protect purchasers from confusion. *See* 15 U.S.C. § 1127 (1988) (intent "to regulate commerce within [its control] by making actionable the deceptive and misleading use of marks in such commerce; [and] ... to protect persons engaged in such commerce against unfair competition...."). *See also Ferrari*, 944 F.2d at 1245, 20 USPQ2d at 1010. Except to determine an opposer's standing, however, there is no requirement for the Board in an opposition to consider the potential harm to opposer's business reputation. While it can be argued that when business reputation is not harmed, any confusion in the marketplace is inconsequential, the statute itself only requires the Board to look to likelihood of confusion among the relevant public. Although consideration of damage to a prior mark holder's business reputation might be a useful test in some cases, it certainly cannot supplant the statutory test of "likely ... to cause confusion, or to cause mistake, or to deceive...." 15 U.S.C. § 1052(d).

## CONCLUSION

In view of the different purchasers and the differences in what each company sold, the sophistication of most purchasers, and the other factors discussed above, we hold that likelihood of confusion among relevant persons has not been proven. The Board's decision sustaining the opposition is

REVERSED.