**Danforth S. DeSENA, DPM, and Solistice Corporation, Plaintiffs**

v.

**BEEKLEY CORPORATION, Defendant.**

**Civil No. 09–352–P–H.**

United States District Court,
D. Maine.

Aug. 3, 2010.

---

Andrea B. Reed, Jeffrey L. Snow, Christopher Centurelli, K & L Gates LLP, Boston, MA, Patricia M. Mathers, Bohan Mathers & Associates LLC, Kathryn K. Rowen, Taylor, McCormack & Frame, LLC, Portland, ME, for Plaintiffs.

Eric E. Grondahl, James E. Regan, Mark D. Giarratana, McCarter & English, LLP, Hartford, CT, John G. Osborn,

Leonard M. Gulino, Bernstein, Shur, Portland, ME, for Defendant.

### * DECISION AND ORDER ON MOTIONS FOR CLAIMS CONSTRUCTION, SUMMARY JUDGMENT AND TO EXCLUDE EXPERT WITNESSES

D. BROCK HORNBY, District Judge.

This case is primarily a patent dispute. It involves skin markers that medical practitioners use to demarcate a particular area or feature of concern that will then be highlighted on subsequent x-rays. There are also accusations of trademark infringement, false advertising, false patent marking, and deceptive trade practices. After a hearing on June 3, 2010, I construe the claims of the two patents held by the warring patent holders, and rule upon their motions for claim construction, summary judgment, and exclusion of expert testimony.

### THE '106 PATENT

The plaintiffs (they are Dr. Danforth S. DeSena, the inventor, and his company, Solstice Corporation (collectively "Solstice")) ask me to construe claims 1, 2, 3, 6, 7 and 10 of their U.S. Patent No. 5,193,106 (the '106 patent) and to grant them summary judgment on claims 1, 2 and 3. The defendant Beekley Corporation ("Beekley") moves for summary judgment of non-infringement on claims 1, 2, 3, 6, 7 and 10 of the '106 patent.

The '106 patent is entitled "X–Ray Identification Marker." According to Solstice's legal memorandum:

> The '106 patent describes and claims a marker device. The device includes a tape with a pressure-sensitive adhesive backing on one side and a radiopaque material on the other non-adhesive side.

The radiopaque material is disposed on the tape to form various shapes, e.g., triangles, squares, or circles, as shown in Figure 2 of the patent . . .

> These shapes are "designed to enclose small cutaneous landmarks," such as lesions or other palpable masses. The circle shape "is provided in sizes ranging from about 1.0 up to about 3.0 centimeters in inner diameter." The "radiopaque material may be in powder, wire, or paint form; metallic materials such as barium sulfate, aluminum, and lead, may be used." In use, the marker is affixed to a patient's skin such that the shape of radiopaque material surrounds the landmark. When the x-ray is taken, the radiopaque material's shape is superimposed upon the x-ray photograph, identifying the location of the skin landmark.

Pls.' Mot. For Summ. J. 1–2 (citations and figures omitted) (Docket Item 110).

What the patent actually says is:

I claim:

1. A marker device to be used in the x-ray examination of problematic deep structures of the foot, wherein said problematic deep structures of the foot are denoted by cutaneous landmarks, said marker device comprising:

 a. A tape with pressure-sensitive adhesive on one surface thereof and a non-adhering surface on a side opposite, wherein said tape is suitable for attachment to the surface of the skin of the foot, and

 b. A radiopaque material affixed to said non-adhering surface of said tape, wherein said radiopaque material is formed into a shape such that it completely surrounds a cutaneous landmark in a surrounding shape of

**380**

an internal size comparable to that of cutaneous landmarks of podiatric pathologies. Claim 1, '106 patent col. 5–6 ll. 51–53 and ll. 1–13 (Docket Item 56–2) attached as Ex. A to Pls.' Mot. For Claims Construction. Claims 2 and 3 are dependent claims, deriving from Claim 1. Claim 6 is the same as Claim 1 through subpart a, but has a different subpart b and subpart c as follows:

b. radiopaque material, wherein said radiopaque material is deposited onto said non-adhering surface of said tape to form a plurality of circles, wherein each of said circles has an inner diameter of a dimension sufficient to completely surround cutaneous landmarks of podiatric pathologies, and

c. A plurality of sets of perforations incorporated into said tape, wherein each of said plurality of circles is affixed to said tape between each pair of adjacent sets of perforations.

*Id.* at col. 6 ll. 33–42. Claims 7 and 10 are dependent claims, deriving from Claim 6.

The major controversy between the parties on this patent is the significance of the repeated references in the patent to the foot and podiatry. Beekley says that its products do not infringe the '106 patent because it sells its allegedly infringing devices solely for mammography, not podiatry, and Solstice admits that there is no evidence that Beekley's mammography markers are used in podiatry. Pls.' Opp'n Statement of Facts and Additional Facts in Resp. to Def.'s Mot. For Summ. J. ¶ 1 (Docket Item 112–1); Flannery Aff. ¶¶ 13, 14 (Docket Item 67–1) attached as Ex. O to Wantek Aff. Solstice maintains that these are nevertheless infringing activities because, according to its reading of the '106 patent, it is not limited to podiatric uses. There are other disagreements, but that is the major point of controversy.

■ The Federal Circuit has prescribed the rules for construing a patent's claims. Specifically, "[i]t is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir.2005) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed.Cir.2004)). The Federal Circuit has explained that a reason for this, quoting the Supreme Court, is that "it is 'unjust to the public, as well as an evasion of the law, to construe it in a manner different from the plain import of its terms.'" *Id.* (quoting *White v. Dunbar*, 119 U.S. 47, 52, 7 S.Ct. 72, 30 L.Ed. 303 (1886)). The words of a claim "are generally given their ordinary and customary meaning," "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Id.* at 1312–13 (citations omitted). Sometimes, "the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314.

■ That is the case here. On its face, the '106 claims are explicitly for a marker device that is to be used for x-rays of "problematic deep structures of the foot," with tape that can be attached to the "skin of the foot," where the size of the marker is related to "cutaneous landmarks of podiatric pathologies." These statements of the claims use commonly understood words with widely accepted meaning. They do not cover mammography.

But Solstice says that this conclusion places too much weight on the use that the inventor envisioned for the apparatus and on the claims' preamble (the portion of the

claims preceding the word "comprising"). Solstice says that a proposed use for an apparatus appearing in a preamble is not necessarily a limitation of a claim, and cites the following passage from *Catalina Marketing International, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed.Cir. 2002):

> In general, a preamble limits the invention if it recites essential structure or steps, or if it is "necessary to give life, meaning, and vitality" to the claim. Conversely, a preamble is not limiting "where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention."

Solstice says that for the '106 patent, the reference to "problematic deep structures of the foot" does not recite "essential structure or steps," or "give life, meaning or vitality to the claim." According to Solstice, the reference states only a "purpose or intended use for the invention." The invention, says Solstice, is an x-ray identification marker, as the patent title states; use in podiatry is merely one possible use. Pls.' Mot. for Claim Construction at 10–11 (Docket Item 56). Solstice also points to *Catalina*'s language that where the patent is for an apparatus, as here, "preambles describing the use of an invention generally do not limit the claims because the patentability of apparatus ... claims depends on the claimed structure, not on the use or purpose of that structure." *Catalina*, 289 F.3d at 809.[1] In-

stead, an apparatus patent "grants the right to exclude others from making, using, selling, offering to sale, or importing the claimed apparatus ... for *any* use of that apparatus ..., whether or not the patentee envisioned such use." *Id.* (emphasis added). That is the case here, says Solstice. It is the apparatus that is patented, and even though the inventor contemplated podiatric use, the patent covers its use for other purposes, including mammography.

*Catalina* also says, however, that "statements of intended use or asserted benefits in the preamble may, in rare instances, limit apparatus claims, but only if the applicant clearly and unmistakably relied on those uses or benefits to distinguish prior art." *Id.* According to *Catalina*, "clear reliance on the preamble during prosecution to distinguish the claimed invention from the prior art transforms the preamble into a claim limitation." *Id.* at 808 (speaking of patent claims generally, not just apparatus claims); *accord Bass Pro Trademarks, LLC v. Cabela's, Inc.*, 485 F.3d 1364, 1369 (Fed.Cir.2007).[2] Unfortunately for Solstice's infringement claim, that is exactly what happened here.

Under "Description of the Prior Art," the initial 1990 application for the '106 patent discussed in detail the difficulties of x-rays for podiatrists, and the need to relate things like palpable masses and cutaneous lesions to underlying deep structure problems in the foot. It then discussed particular patents already in

---

1. Thus, a new use for an already known apparatus or structure does not itself create patentability. *In re Schreiber*, 128 F.3d 1473, 1477 (Fed.Cir.1997).

2. *See also Purdue Pharma L.P. v. Endo Pharm. Inc.*, 438 F.3d 1123, 1136 (Fed.Cir.2006) ("Under the doctrine of prosecution disclaimer, a patentee may limit the meaning of a claim term by making a clear and unmistakable disavowal of scope during prosecution.

This may occur, for example, when the patentee explicitly characterizes an aspect of his invention in a specific manner to overcome prior art."); *accord Cordis Corp. v. Medtronic Ave, Inc.*, 511 F.3d 1157, 1177 (Fed.Cir.2008) ("[C]lear and unmistakable surrenders of subject matter" can occur during prosecution "if the statements in question [are] such that 'a competitor would reasonably believe that the applicant had surrendered the relevant subject matter.' ").

existence, distinguishing one (Duska) as limited in usefulness "to the evaluation of large bones, such as the bones of the legs and arms" and not adequate for "small bones, such as those of the feet," or for "fine work, such as in the examination of the small bones of the toes." Patent Application Serial No. 07573897 at 2–3 (Docket Item 75) attached as Ex. B Part 1 to Regan Aff. It distinguished another (Williams) as "effective in indexing cross-sectional scans of the entire body, but it would hinder podiatric evaluations of much smaller areas of interest." *Id.* at 3–4. A third (Gulleckson) was distinguished as "limited to pinpointing foreign objects in the body . . . and therefore is generally not applicable to the examination of bones of the foot." *Id.* at 4. This section on Prior Art went on to describe the particular needs of podiatrists and said: "It is therefore an object of the present invention to overcome the problems associated with the prior art markers by providing to podiatrists a marker to be used in the evaluation of the small bones of the feet that will sharply delineate an area of interest without obscuring it." *Id.* at 5.

The examiner rejected the claims in March of 1991 due to, among other reasons, the Williams prior art. Patent Application Serial No. 07573897 at Bates Nos. 53–55 (Docket Item 79) attached as Ex. B Part 2 to Regan Aff. In responding to the rejection, the inventor stated that "the purpose of his invention is to provide an x-ray examination device to be used by *podiatrists* [emphasis in original] in the evaluation of problematic deep structures of the foot. The amended language of the two independent claims clearly describes a device which achieves this goal." [3] *Id.* at Bates No. 64. Moreover, the applicant

amended the preamble to distinguish the Williams prior art: "In the preamble of Claim 1 (and in Claim [6] as well) Applicant notes that the marker device relates to the x-ray examination of problematic deep structures of the foot *only.* By that language, Applicant has *limited the focus of the invention to x-ray techniques of concern to the podiatrist.*" *Id.* at Bates No. 65 (emphasis added). "Applicant respectfully submits that his marker device is quite distinct from the one disclosed by Williams et al., *particularly in view of the use* to which each is applied. . . . The marker device has been specifically designed to overcome the problems podiatrists have found to be associated with prior art markers." *Id.* (emphasis added). In *Catalina's* language, this was a clear and unmistakable reliance on use.

The examiner rejected the application again in September 1991 for, among other reasons, additional prior art (Michelson). *Id.* at Bates Nos. 73–74. In a December 1991 response, the applicant "respectfully submits that his marker device is completely distinct from the marker disclosed by Michelson in that it is *specifically* [emphasis in original] directed to podiatric pathologies *only* [emphasis added] and it overcomes the problems of prior art marker devices in that it highlights rather than obscures the area of interest with the radiopaque material." Amendment Request for Reconsideration at 5 (Docket Item 78–1) attached as Ex. C to Regan Aff. Here again, the applicant relied on podiatric use to distinguish the prior art and narrow the scope of his invention. The patent examiner considered this amendment, but still did not allow the application. Advisory Action of January 6, 1992 at Bates No. 88 attached as Ex. B Part 3 (Docket Item 80) to Regan Aff.

---

3. Similarly, "the key feature of the invention remains the formation of such radiopaque materials into shapes which isolate the partic- ular area of the foot that is of interest." *Id.* at Bates No. 68.

The applicant next took an appeal to the Board of Patent Appeals and Interferences and, while the appeal was pending, the examiner decided to allow the patent to issue as distinct over the prior art. Notice of Allowability June 29, 1992, at Bates No. 170 attached as Ex. B Part 6 (Docket Item 83) to Regan Aff. The examiner stated:

> The following is an Examiner's Statement of Reasons for Allowance: the prior art lacks a teaching which discloses a marking device having radiopaque material affixed to a non-adhering surface of a tape, wherein said radiopaque material is formed in a shape such that it completely surrounds a cutaneous landmark. To the best understanding of the examiner, in podiatry, a cutaneous landmark is normally referred to as a deep structure problem in a foot and that the size of this problem only ranges from 1.0 cm to about 3.0 cm. In view of the aforementioned understanding and reading the claims in terms of the teaching of the specification, a shape or size of the radiopaque material of the claimed invention must measure somewhere between 1.0 cm to 3.0 cm.

*Id.* at Bates No. 171. Solstice challenged the size limitation that the examiner imposed.[4] Solstice did not challenge the examiner's rationale that related to podiatry and the foot, but instead reaffirmed that limitation: "Applicant's broadest claims are not directed to a surrounding marker device with internal dimensions specifically of 1.0 to 3.0 cm. Instead, Applicant's invention is directed to a marker device that encompasses cutaneous landmarks which are *unique to the foot.*" Comments on Statement of Reasons for Allowance September 28, 1992 (emphasis added) at Bates No. 181 attached as Ex. B Part 6 (Docket Item 83) to Regan Aff.[5] The patent issued on March 9, 1993.[6] *Id.* at Bates No. 183.

The public record of the prosecution history, therefore—the "official record that is created in the knowledge that its audience is not only the patent examining officials and the applicant, but the interested public"[7]—demonstrates that Solstice consis-

---

**4.** Solstice stated that typical foot cutaneous landmarks are 1 to 3 centimeters, but that "[n]owhere is it stated by Applicant that cutaneous landmarks associated with deep structure problems of the foot are only about 1.0 to 3.0 centimeters in size. It is certainly possible to have problem-identifying marks on the foot that are smaller and greater than the sizes noted." *Id.* at Bates No. 182. Solstice concluded:

> For these reasons, Applicant respectfully submits that the Examiner's Statement apparently limiting the novelty of the invention to the supposed size of cutaneous landmarks of the foot is not directed to the novel feature of the invention. *Instead, the novelty of the invention lies in the fact that Applicant's marker can be deployed on the foot* and it is designed such that the radiopaque material surrounds the cutaneous landmark, thereby highlighting the underlying problem rather than obscuring it."

*Id.* (emphasis added).

**5.** I recognize that in *Salazar v. Procter & Gamble Co.*, 414 F.3d 1342 (Fed.Cir.2005),

the Federal Circuit said that "an Examiner's Statement of Reasons for Allowance 'will not necessarily limit a claim,'" *id.* at 1345 (quoting *ACCO Brands, Inc. v. Micro Sec. Devices, Inc.*, 346 F.3d 1075, 1079 (Fed.Cir.2003)), and that silence in the face of an Examiner's statement is not a disavowal of a claim's scope, *id.* at 1347. Here, however, the applicant reaffirmed the foot limitation in responding to the Examiner, and thus the applicant and the Examiner both had the same understanding. *See ACCO*, 346 F.3d at 1078–79; *Bell Atlantic Network Services, Inc. v. Covad Commc'ns Group*, 262 F.3d 1258, 1273–74 (Fed.Cir.2001).

**6.** There appears to have been no change made to the patent as a result of the examiner's statement.

**7.** *See Biogen, Inc. v. Berlex Labs., Inc.*, 318 F.3d 1132, 1139 (Fed.Cir.2003) ("The court correctly viewed the prosecution history not for the examiner's or the applicant's subjective intent, but as an official record that is

tently and repeatedly distinguished the prior art by limiting use of its '106 patent to foot markers and podiatry. The preamble's language in Claims 1 and 6 that the invention is for the foot thus becomes a claim limitation under *Catalina,* and all the other claims depend upon Claims 1 and 6.

I also consider the specification. The Federal Circuit instructs that "claims 'must be read in view of the specification, of which they are a part'" because claims "are part of 'a fully integrated written instrument.'" *Phillips,* 415 F.3d at 1315 (quoting *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 979, 978 (Fed.Cir. 1995) (en banc), aff'd, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996)). Here,

the specification refers repeatedly to the foot, podiatrists, podiatry, toes, standing, and plantar abnormalities, never to any other parts of the body. As a result, it does not alter my conclusion that the preamble language along with the prosecution history creates a claim limitation for foot-related uses.

■ Because Beekley sells its markers only for mammography, not for foot x-rays, there is no infringement as I construe the patent's claims.[8] I therefore DENY the plaintiffs' motion for summary judgment of infringement on Claims 1, 2, and 3, and GRANT the defendant's motion for summary judgment of noninfringement

created in the knowledge that its audience is not only the patent examining officials and the applicant, but the interested public.").

8. Nevertheless, in case there is an appeal, I construe some of the other terms in the '106 patent as requested by the parties. In some instances, the claim language is already clear on its face, and the requested construction is simply requesting different words, rather than clarifying meaning. Trial courts are required to resolve disputed meanings and scope of a patent claim, but they are not required to construe every limitation in a patent as an "obligatory exercise in redundancy." *O2 Micro Intern. Ltd. v. Beyond Innovation Tech. Co., Ltd.,* 521 F.3d 1351, 1362–63 (Fed.Cir. 2008) ("We ... recognize that district courts are not (and should not be) required to construe every limitation present in a patent's asserted claims."); *Vivid Techs., Inc. v. Am. Science & Eng'g, Inc.,* 200 F.3d 795, 803 (Fed.Cir.1999) (a court must construe "only those [claim] terms ... that are in controversy, and only to the extent necessary to resolve the controversy."); *U.S. Surgical Corp. v. Ethicon, Inc.,* 103 F.3d 1554, 1568 (Fed.Cir. 1997) (Claim construction "is not an obligatory exercise in redundancy." Rather, "[c]laim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement."). I follow that guidance in determining which terms to construe. This case is *Phillips'* example of a

patent whose claims can be construed by applying "the widely accepted meaning of commonly understood words." 415 F.3d at 1314. There is no need for expert interpretation.

In plain language a "marker device" means a device for marking used in x-ray examination.

The plain language meaning of "tape" is a narrow flexible strip or band. *See* Webster's Third New International Dictionary at 2339 (2002) ("narrow strip of cloth"). Although tape can have adhesive applied to one or both sides, that characteristic is not integral to tape.

"Perforations" are a series of holes that facilitate tearing or separation, and a "plurality of sets of perforations incorporated into said tape" means two or more sets of holes incorporated into the tape to facilitate separation of individual segments of the tape. '106 patent at col. 6 ll. 39–40.

"Radiopaque" means "being opaque to X rays or other forms of radiation." Webster's Third New International Dictionary at 1873. "Opaque" means "impervious to the rays of visible light: not transparent or translucent," or "impervious to forms of radiant energy other than visible light." *Id.* at 1579. Solstice says that radiopaque can nevertheless mean partially translucent on a radiograph or x-ray because there are degrees of radiopacity. If Solstice had meant to teach a *partially* radiopaque material, it could and should have said so in the patent.

as to claims 1, 2, 3, 6, 7, and 10 of the '106 patent.[9]

## THE '461 PATENT

Solstice extended its focus from podiatry into the mammography marker market in 2008 with its Solstice scar markers. Solstice Corp. Annual Sales Jan. 1996–Dec. 2009 (Docket Item 161–4) attached as Ex. 20 to Swift Aff. Beekley has counterclaimed that the Solstice scar markers infringe claims 21, 23, 24 and 28 of Beekley's U.S. Patent No. 36,461 for a "Radiology Marker System and Dispenser." U.S. Patent No. 36,461 (the '461 patent) (Docket Item No. 110–10) (Third Counterclaim). Solstice asks for summary judgment that the scar markers do not infringe.

Claim 21 of the '461 patent, the claim in question,[10] claims:

A marker system for use in radiology, comprising:

An elongated base tape having a length,

A bendable wire containing a material that is opaque to imaging radiation, the wire having a covering thereon and extending in a direction parallel to the length of the base tape, and

A plurality of adhesive support pads fixedly aligned along the covered wire, the adhesive support pads being releasably adhered to the base tape and being manually removable from the base tape together with the covered wire for releasable adherence to a subject.

*Id.* at col. 5 ll. 48–58. Solstice asks me to construe the terms "wire" and "covering" before rendering summary judgment, and Beekley adds "tape." Def.'s Opp'n to Pls.' Mot. For Summ. J. at 6 (Docket Item 153). All are "commonly understood words" under *Phillips*. I have already found in the '106 patent that the widely accepted meaning of the term "tape" is a narrow flexible strip or band. That construction of "tape" is equally applicable to the '461 patent. The widely accepted meaning of "wire" is a solid thin thread or rod made of metal,[11]

---

**9.** I also deal with Beekley's laches defense. The '106 patent is due to expire in August 2010, so injunctive relief is not appropriate. Beekley says that there should be no damages for infringement before the date of filing the complaint, August 5, 2009, because it has been selling allegedly infringing products for more than seventeen years, Solstice has known since at least 1999, and Solstice did nothing about it until recently. Beekley relies upon the Federal Circuit's rule that waiting more than six years creates a presumption of laches. *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1035–36 (Fed.Cir. 1992). Beekley makes a strong case, but the laches issue here is not appropriate for summary judgment. The summary judgment record does not conclusively demonstrate that Solstice knew or should have known of the infringement more than six years before it filed suit, the standard for causing the presumption to arise. *Id.* at 1028. Although there is a 1995 Beekley product information sheet in the Solstice records with the inventor's handwriting about prices from 1999, he professes no recollection of it. Beekley records show that Solstice purchased only noninfringing markers in 1999. Thus, I cannot find as a matter of summary judgment that Solstice knew or should have known of the infringement, and therefore the burden of production does not shift to Solstice. Beekley cannot show at summary judgment that prejudice to it, either economic or evidentiary, is undisputed or that Solstice's delay was unreasonable. Perhaps it would persuade me at trial (laches is not a jury issue, *A.C. Aukerman*, 960 F.2d at 1033–34), had I not granted summary judgment in its favor on infringement.

**10.** Only claim 21 is an independent claim. My ruling on claim 21 disposes of the other three claims as well.

**11.** In a late-filed affidavit, Beekley's expert refers to a 2009 website reference to a German development of a "new metal-free guide wire" to permit the use of MRIs instead of x-rays for imaging during catheterization. Cronin Aff. ¶ 13 (Docket Item 167). Even if I entertain that late submission, it does not change the outcome. *See* note 13 *infra*. He does agree that the term wires means "thin threads or rods." Cronin Aff. ¶ 13.

*i.e.*, it is continuous. *See* Webster's Third New International Dictionary at 2623 (2002). (It need not be drawn.) Contrary to Beekley and its expert, one cannot use "wirelike" to define "wire." (Definition works in the opposite direction.) A "covering thereon" means simply that the wire is covered or coated. I proceed, then, to determine whether there is evidence for a jury that Solstice infringed Beekley's '461 patent either literally or under the doctrine of equivalents.

### A. Literal Infringement

The Solstice scar markers do not contain a wire as such. Instead, currently they have a series of markings formed from a radiopaque ink. A very fine metal powder (calcium carbonate or metal particles, Statement of Material Facts ("S.M.F.") ¶¶ 30–31 (Docket Item 110–1)),[12] is dispersed in a polymeric or ink binder, which makes the ink radiopaque. The radiopaque ink is printed directly onto a non-adhesive surface of a medical grade tape as a series of dashed markings. The tape can be manipulated into a desired shape. Previously, Solstice used an extruded rubber-like compound formed from a powder of fine calcium carbonate particles embedded in a viscoelastic binder. S.M.F. ¶ 31. Unlike the current dashed markings, it was continuous.

The current dashed markings are not a "wire." This component of the accused product is not a solid metal form in the shape of a thin bendable thread or rod. The previous extruded compound, although continuous, was also not a wire. It was not made of metal. Moreover, both versions of the Solstice scar markers lack

a covering; no covering is applied to the dashed marking or the extruded compound. S.M.F. ¶¶ 30, 31. (Beekley denies this assertion on the basis that the meaning of "covering" is a question of law. However, it admits that its Rule 30(b)(6) deponent could not identify a cover on the current version. Def.'s Statement of Additional Facts ("S.A.F.") ¶ 30. (Docket Item 154).)

■ Beekley's technical expert, Dr. Cronin, declares that Solstice's scar markers include a component that is "wirelike." S.M.F. ¶ 96. He also asserts that the radiopaque ink (in the case of Solstice's current product) or the extruded compound (in the case of Solstice's prior product) constitutes a covering. *Id.* I will consider those assertions under the Doctrine of Equivalents analysis. But as for literal infringement, I conclude that the Solstice scar markers lack a wire, or a covering thereon, and cannot satisfy the wire-and-covering limitation of the claims of the '461 patent.[13] Accordingly, there is no literal infringement, because the Solstice scar markers do not meet each and every limitation of the asserted claims. *See Key Mfg. Group, Inc. v. Microdot, Inc.*, 925 F.2d 1444, 1449 (Fed.Cir.1991).

### B. Doctrine of Equivalents

■ If there is no literal infringement, infringement can nevertheless occur under the doctrine of equivalents if "the accused product contain[s] each limitation of the claim or its equivalent." *Eagle Comtronics, Inc. v. Arrow Commc'n Labs., Inc.*, 305 F.3d 1303, 1315 (Fed.Cir.2002); *Riles v. Shell Exploration and Prod. Co.*, 298

---

**12.** When I cite to the statement of facts or the statement of additional facts, I refer to statements that have been admitted for purposes of summary judgment practice.

**13.** Even if I were to accept Dr. Cronin's late-filed affidavit and its reference to the inven-

tion of a "new metal-free guide wire" for MRI imaging of catheterization procedures, what Solstice uses is not such a wire and there still is no literal infringement because there is no covering for what Solstice uses.

F.3d 1302, 1309 (Fed.Cir.2002) (same). An element is "equivalent to a claim limitation if the differences between the two are 'insubstantial' to one of ordinary skill in the art. Relevant to the insubstantial differences inquiry is whether the missing element in the accused device 'performs substantially the same function in substantially the same way to obtain the same result' as the claim limitation." *Eagle Comtronics,* 305 F.3d at 1315. But a court never reaches the "insubstantial differences" inquiry "if a claim limitation is totally missing from the accused device." *Id.* at 1312. This requirement is sometimes referred to as "the all-limitations rule." *Id.*

Beekley argues that there is a jury question whether the Solstice scar markers infringe its '461 patent under the doctrine of equivalents, because the Solstice scar markers perform substantially the same function, in substantially the same way, to achieve substantially the same result, as each limitation of claim 21. Def.'s Opp'n to Pls.' Mot. For Summ. J. at 10. Solstice disagrees. The issue once again is the wire-and-covering. Beekley says that the ink or the extruded compound in Solstice's radiopaque markers amounts to both the bendable wire *and* the covering. Solstice responds that this locution vitiates either the "wire" or the "covering" limitation, because if the ink or rubber-like compound is the "wire," then the Solstice products do not meet the "covering" limitation, and if the ink or rubber-like compound is the covering, then there is no "wire." *See Tronzo v. Biomet, Inc.,* 156 F.3d 1154, 1160 (Fed.Cir.1998) ("If a theory of equivalence would vitiate a claim limitation, ... then there can be no infringement under the doctrine of equiva-

lents as a matter of law."); *Cooper Cameron Corp. v. Kvaerner Oilfield Prods., Inc.,* 291 F.3d 1317, 1321–22 (Fed.Cir.2002). Thus, Solstice argues that Beekley cannot satisfy the "all-limitations rule" and that the Solstice markers escape infringement because they are missing one of the '461 patent's claim limitations.

There is, however, an important qualification to the all-limitations rule. According to the Federal Circuit:

> While a claim limitation cannot be totally missing from an accused device, whether or not a limitation is deemed to be vitiated must take into account that when two elements of the accused device perform a single function of the patented invention, *or when separate claim limitations are combined into a single element of the accused device,* a claim limitation is not necessarily vitiated, and the doctrine of equivalents may still apply if the differences are insubstantial.

*Eagle Comtronics, Inc.,* 305 F.3d at 1317 (emphasis added).[14] Beekley says that is what Solstice has done in its scar markers—that it has combined two separate claims limitations from the '461 patent into a single element of the scar markers, namely, the use of the ink or the extruded compound. Under *Eagle Comtronics* a court still must construe the claim, but once the claim is construed, it remains a question of fact whether an accused product that collapses two elements is "insubstantially different" from the patent claim. *Id.*

■ I conclude that Beekley has submitted enough to avoid summary judgment on this issue. As set forth in the '461 patent and in the report of Beekley's expert Dr. Cronin, a radiologist who regular-

---

14. *Riles v. Shell Exploration,* 298 F.3d 1302, 1310 (Fed.Cir.2002), and *Ethicon Endo–Surgery v. U.S. Surgical Corp.,* 149 F.3d 1309, 1320 (Fed.Cir.1998), are examples of the oth-

er half of the *Eagle Comtronics* exception, *i.e.,* the accused device uses two elements as the equivalent of one element of the patented invention.

ly performs mammography, the function of the patent's bendable wire limitation is to allow the opaque material to be bent to a desired position or shape, such as to track a scar on a subject's skin, thereby creating a thin image on the radiographic film. S.A.F. ¶¶ 31–32. The function of the covering, he says, is to cover the opaque material. S.A.F. ¶ 35. (The patent says that the function of the covering limitation is simply to "render it safe and comfortable when placed on a patient's body." '461 patent col. 2 ll. 57–59.)

Beekley asserts that the Solstice markers perform substantially the same functions, in substantially the same way, to achieve substantially the same result, by using a "wirelike component." S.A.F. ¶ 33. The "wirelike component" of the Solstice markers, it says, includes a material that is opaque to imaging radiation and therefore forms a thin line on the radiograph. S.A.F. ¶ 34. The "wirelike component" is flexible, allowing the marker to be manually bent to follow a scar or other desired line or feature on the subject's skin, just as Beekley's covered wire can be bent. S.A.F. ¶ 33. In both the first and second Solstice scar markers, the viscoelastic polymer or ink covers or coats the material that is opaque to imaging radiation. Expert Rpt. of Edward Cronin ¶ 46 (Docket Item 110–9) attached as Ex. H to Pls.' Mot. For Summ. J.[15] Although Solstice largely disagrees with these assertions, Beekley has presented enough for a jury to find that the Solstice design would achieve all the objectives of Beekley's covered wire.

Finally, Solstice argues that applying the doctrine of equivalents to its use of radiopaque ink "would be an impermissible encompassing of the prior art" because an earlier Duska patent already disclosed a series of radiopaque markings in a dashed line of ink or paint on a tape. Pls.' Mot. For Summ. J. at 20. It is true that "a patentee should not be able to obtain, under the doctrine of equivalents, coverage which he could not lawfully have obtained from the PTO by literal claims," and that just as "prior art always limits what an inventor could have claimed, it limits the range of permissible equivalents of a claim." *Wilson Sporting Goods Co. v. David Geoffrey & Assoc.*, 904 F.2d 677, 684 (Fed.Cir.1990), *overruled on other grounds by Cardinal Chem. Co. v. Morton Int'l, Inc.*, 508 U.S. 83, 113 S.Ct. 1967, 124 L.Ed.2d 1 (1993). But the focus is on the invention as a whole, not the individual limitations: "Nothing is taken from the 'public domain' when the issue of equivalency is directed to a limitation only, in contrast to the entirety of the claimed invention." *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1261 (Fed.Cir.1989). Indeed, "[a] claim to a mechanical device usually recites a combination of several elements, most or all of which may be separately known. That an *element* of an accused device already existed does not bar equivalency as to that element." *Fiskars, Inc. v. Hunt Mfg. Co.*, 221 F.3d 1318, 1324 (Fed.Cir.2000) (emphasis added). That is the case here. The Duska prior art of radiopaque ink is not alone enough to avoid application of the doctrine of equivalents.[16]

15. Solstice asserts that Dr. Cronin did not address the doctrine of equivalents in his expert report. Dr. Cronin did address equivalents in his initial report, albeit his opinions are amplified in his late affidavit. Cronin Expert Rpt. ¶ 47. Dr. Petra Lewis, Solstice's expert, has offered no opinion on the doctrine of equivalents.

16. Beekley points out that Duska does not teach or suggest "a plurality of adhesive support pads," an element of Beekley's invention that "allows the wire to be bent to conform to the shape of a scar and releasably adhered to the skin overlying the scar in that shape." Def.'s Opp'n to Pls.' Mot. For Summ. J. at 12; S.A.F. ¶ 39.

Therefore, I conclude that a jury could find that the two claim limitations of wire and covering are combined in a single element: Solstice's wirelike component, performing substantially the same function, in substantially the same way, to achieve substantially the same result, as the claimed wire-and-covering. Solstice's summary judgment motion based on non-infringement will be denied.

### CLAIMS OTHER THAN PATENT CLAIMS

Beekley has made federal false patent marking, false advertising and trademark infringement claims, and state deceptive practices claims in its counterclaims against Solstice. I conclude that only one of them survives summary judgment, and only barely. I deal with it first.

### A. False Marking (Fourth Counterclaim)

█ In its Fourth Counterclaim, Beekley alleges that, through its advertising, Solstice falsely marked its mammography scar markers as patented under the Solstice '106 patent, a violation of 35 U.S.C. § 292. Am. Answer and Countercls. ¶¶ 22–26 (Docket Item 42).[17] The false marking statute provides that "[w]hoever ... uses in advertising in connection with any unpatented article the word 'patent' or any word or number importing the same is patented for the purpose of deceiving the public ... [s]hall be fined." 35 U.S.C.

§ 292(a). There are two elements of a false marking claim under section 292:(1) marking an unpatented article, and (2) an intent to deceive. *Forest Group, Inc. v. Bon Tool Co.*, 590 F.3d 1295, 1300 (Fed. Cir.2009).

Solstice admits that the '106 patent does not cover its scar markers. DeSena Dep. at 176, Nov. 6, 2009 (Docket Item 155–2) attached as Ex. 2 to Swift Aff. But for some time, the Solstice webpage advertising scar markers contained a reference to "U.S. Patent # 5,193,106" near an image of and information about the Solstice scar marker. Solstice Scar Marker internet webpage dated Oct. 5, 2009 (Docket Item 110–16) attached as Ex. O to Pls.' Statement of Undisputed Facts. After Beekley filed its counterclaim alleging that the Solstice website misstated that the mammography scar marker was covered by the '106 patent, Solstice removed that reference from its website on October 6, 2009. *Id.* dated Oct. 6, 2009.

A Solstice employee produced the Solstice website under inventor DeSena's direction. DeSena testified that he was responsible for the content of the website and reviewed the website content. DeSena Dep. at 175–77. DeSena tasked the assigned employee with placing the '106 patent number on the webpages of mammography mole and lesion markers,[18] but not on the webpage of mammography scar

---

**17.** Beekley says that this counterclaim also covers a claim of false marking in Solstice's referring to the '106 patent on its mammography mole and lesion markers. But for those markers (unlike the scar markers), there is the hotly contested patent issue I have resolved at the outset of this opinion. Given that legitimate disagreement over the scope of Solstice's patent claims, Beekley cannot prove intent to deceive in Solstice's claim that the '106 patent covers the mammography mole and lesion markers.

**18.** Solstice offers a variety of mammography markers for sale, including scar markers and

other markers such as nipple markers, mole markers, and lesion markers. Solstice Internet webpage (Docket Item 110–13) attached as Ex. L to Pls.' Statement of Undisputed Facts. Solstice marks its mole markers and lesion markers with the number of the '106 patent. *Id.* In addition to marking the '106 patent number on product packaging and print advertisements for its mole and lesion markers, Solstice also displays the '106 patent number on its website pages relating to mole and lesion markers. S.M.F. ¶ 35; S.A.F. ¶ 35 (qualifying that Solstice has not "always" had the '106 patent number on its markers).

markers. *Id.* at 175–76. DeSena has never believed that the scar marker was covered by the '106 patent. *Id.* at 176. DeSena explained that the erroneous marking of the '106 patent number on the mammography scar marker page was an "oversight". *Id.* at 177.

■ "A party asserting false marking must show by a preponderance of the evidence that the accused party did not have a reasonable belief that the articles were properly marked." *Forest Group*, 590 F.3d at 1300 (citing *Clontech Labs. Inc. v. Invitrogen Corp.*, 406 F.3d 1347, 1352–53 (Fed.Cir.2005)). Solstice concedes that element. It is undisputed that the Solstice scar markers were falsely marked as subject to patent on the webpage and that there was no basis for so marking them.

■ I conclude that the remaining question—whether Solstice or DeSena intended to deceive—is a question of fact for the factfinder. Intent to deceive is a state of mind where a party makes a misrepresentation with knowledge of its falsity. *Clontech Labs.*, 406 F.3d at 1352. It arises when "a party acts with sufficient knowledge that what it is saying is not so and consequently that the recipient of its saying will be misled into thinking that the statement is true." *Id.* (quoting *Seven Cases of Eckman's Alterative v. United States*, 239 U.S. 510, 517–18, 36 S.Ct. 190, 60 L.Ed. 411 (1916)). "Intent to deceive … is established in law by objective criteria." *Id.* Thus, " 'the fact of misrepresentation coupled with proof that the party making it had knowledge of its falsity is enough to warrant drawing the inference that there was a fraudulent intent.' " *Id.* (quoting *Norton v. Curtiss*, 57 C.C.P.A. 1384, 433 F.2d 779, 795–96 (Cust. & Pat. App.1970)). Here, a factfinder might believe DeSena's explanation of innocent mistake. Or it might not. Accordingly, there is a genuine issue of material fact as to whether Solstice falsely marked its mammography scar markers with the '106 patent number with the intent to deceive the public. (I am assuming without deciding that liability is a jury issue; the penalty, on the other hand, appears to be a decision for the judge according to the Federal Circuit. *Forest Group*, 590 F.3d at 1304.)

I do wonder whether this claim is worth Beekley's effort. Under the statute, the penalty for a violation is a "fine" of "not more than $500," and half of any recovery Beekley obtains goes to the United States Treasury. *See* 35 U.S.C. § 292(b). Whether the alleged false marking, if proved, would permit Beekley to recover for more than a single act of false marking is unclear. Although I have not found any modern cases dealing with fines for false marking in connection with website advertising, the Federal Circuit has recently held that the false marking statute requires courts to impose penalties for false marking on a *per article* basis. *Forest Group*, 590 F.3d at 1301. It is difficult to apply the "per article" rule to website advertising where as here no individual article is marked falsely. The previous precedent was *London v. Everett H. Dunbar Corp.*, 179 F. 506, 508 (1st Cir.1910) and it allowed only a single fine for the *decision* to mark falsely. But *Forest Group* observed that both the statutory language and the underlying policy rationale have changed since *London*. It also disapproved "time-based" approaches (per day, per week, per month) that trial courts had been using, 590 F.3d at 1302, insisting instead on its per article standard. Under *Forest Group*, a district court has wide discretion: "By allowing a range of penalties, the statute provides district courts the discretion to strike a balance between encouraging enforcement of an important public policy and imposing disproportionately large penalties for small, inexpensive items produced in large quantities. In the case of inexpensive mass-produced articles, a court has the discretion to determine

that a fraction of a penny per article is a proper penalty." *Id.* at 1304.

## B. *False advertising (Sixth Counterclaim)*

In its Sixth Counterclaim, Beekley alleges that Solstice engaged in false advertising in violation of 15 U.S.C. § 1125(a) by distributing false and/or misleading statements "that Solstice mammography markers are comparable to Beekley's mammography markers." Am. Answer and Countercls. ¶ 37.

Discovery and the summary judgment papers have limited the dispute to four advertisements: the "Solstice Price Challenge" on the Solstice website advertisement (Docket Item 157–1) attached as Ex. 7 to Swift Aff.; the "Five products, one low price. Inventory made simple!," print advertisement (Docket Item 157–2) attached as Ex. 8 to Swift Aff.; the "Xact™ mammography markers-Five premium products, one low price! Inventory made simple!," print advertisement (Docket Item 157–3) attached as Ex. 9 to Swift Aff.; and a Solstice March 12, 2007 "Company Profile" distribution to "Xact® Imaging Marker Distributors," company profile (Docket Item 157–4) attached as Ex. 10 to Swift Aff. There are four [19] allegedly false statements in these materials: that Solstice markers listed as matched to Beekley markers are "equivalent to, and interchangeable with, every one of the respective Beekley markers"; that "a consumer need only purchase five different Solstice mammography markers in lieu of Beekley's inventory of thirty-five … without any trade-off in product characteristics and performance"; that "Solstice has, in fact, compared and tested each Solstice marker against each of the correspondingly listed Beekley markers and that their equivalence has been verified"; and that "Solstice sells markers in sizes that Solstice, in fact, does not sell."

In fact, the materials in question do not make the statements Beekley describes; the characterizations are Beekley's view of how consumers would read the advertising. On the Solstice Price Challenge website, a consumer is invited to choose a manufacturer and its product, then the website calculates comparative pricing between that manufacturer (such as Beekley) and a Solstice product. The second advertisement lists Solstice markers in juxtaposition

**19.** Beekley raises two additional bases for its false advertising counterclaim in its opposition to summary judgment—that Solstice mutilated Beekley trademarks in its advertising; and that Solstice displays on its website a radiographic image of a see-through mole marker. With respect to the mutilated trademarks, Beekley makes no argument how that would influence a purchasing decision, one of the required elements under *Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.*, 284 F.3d 302, 311 (1st Cir.2002). I therefore do not consider it. Even if Beekley had presented argumentation on this aspect of the false advertising claim, I would find that the dilution of these marks was not pleaded as a basis for this claim. Am. Answer and Countercl. ¶¶ 33–49; *see also* 15 U.S.C. § 1125(c)(1).

With respect to the allegations that Solstice displays on its website a radiographic image of a see-through mole marker when in fact it does not sell such a·marker, Beekley raised this issue for the first time in the affidavit of Martha Flannery and its supplemental response to interrogatory 10 filed with Beekley's opposition to Solstice's motion for summary judgment. *See* Flannery Aff. (Apr. 16, 2010) ¶ 40 (Docket Item 165) and Def.'s First Supplemental Objections and Responses to Pls.' First Set of Interrogs. (No. 10) at 3–5 (Docket Item 164–1) attached as Ex. 31 to Swift Aff. This disclosure after the close of discovery and after Solstice filed its motion for summary judgment is untimely. Beekley was specifically asked in interrogatory 23 to state the factual basis for the false advertising claim and its response did not mention the presence of a see-through marker. *See* Def.'s Second Am. Objection and Responses to Pls.' Second Set of Interrogs. (Nos. 12–26) at 11–13 (Docket Item 110–25) attached as Ex. X to Pls.' Mot. for Summ. J. I do not consider it.

to "their comparable Beekley and St. John [another competitor] Markers." Swift Aff. Exs. 7 and 8 (Docket Items 157–1 and 157–2). Because there are only five Solstice products, several products of a competitor are juxtaposed to each Solstice product. The third advertisement does essentially the same thing but with pictures of the Solstice products. The fourth likewise lists Beekley and St. John products juxtaposed against Solstice products, sometimes saying "no equivalent" in the competitor's product lines (for orthopedics and podiatry, where Solstice is apparently alone) and otherwise listing the competitor's products under the heading "product comparison" or saying "Compare and save." Swift Aff. Exs. 9 and 10 (Docket Items 157–3 and 157–4).

■ " 'Puffery' is exaggerated advertising or unspecified boasting, characterized by vague and subjective statements, upon which no reasonable buyer would rely." *Butcher Co., Inc. v. Bouthot,* 2001 WL 263313, at *1 (D.Me. March 16, 2001) (citing *Clorox Co. v. Proctor & Gamble Commercial Co.,* 228 F.3d 24, 38–39 (1st Cir.2000) and 4 *McCarthy on Trademarks and Unfair Competition* § 27:38). Puffery is not actionable. On the other hand, a claim that "is specific and measurable" is actionable. *Clorox,* 228 F.3d at 38. In *Butcher,* I ruled that statements there that products were "comparable" were "vague and subjective, not specific and measurable, and ... therefore not actionable." *Butcher,* 2001 WL 263313, at *1. In 2001, I quoted a dictionary definition of "comparable" as meaning "capable of or suitable for comparison" and "similar," "like <fabrics of [comparable] quality>." *Id.* The same definition appears on Merriam–Webster's current online dictionary. I conclude once again that it is puffery to say that a competitor's products are "comparable."

It is true that earlier I denied Solstice's motion to dismiss this counterclaim for failure to state a claim under Fed.R.Civ.P. 12(b)(6). My reason was that in the absence of a factual record, I would not rule as a matter of law that a claim that a product was "comparable" to another product must *always* be puffery.

■ But now the facts have been developed, and it is apparent that Solstice's statements about comparability, express or implied, are not specific and measurable. Beekley provides substantial argument about differences between these two competitors' products, and why Beekley products are superior in a variety of ways. If accurate, they should be effective in persuading hospitals and medical practitioners to purchase Beekley products in place of Solstice products. But they do not show that Solstice's express or implied statements as a competitor that its products are "comparable" are anything more than puffery—vague and subjective statements, upon which no reasonable buyer would rely. Instead, Beekley's interpretation of how the word comparable can be used would essentially remove it from competitors' advertising vocabulary.

■ And if the statements and their implications of comparability are not puffery, I conclude that no reasonable jury could find that they are literally false. Without proof of literal falsity, Beekley must provide evidence of likely consumer deception. *Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.,* 284 F.3d 302, 311 (1st Cir.2002). Consumer deception is established when the advertisement "conveys a misleading message to the viewing public." *Clorox,* 228 F.3d at 33 (citing *Sandoz Pharms. Corp. v. Richardson–Vicks, Inc.,* 902 F.2d 222, 228–29 (3d Cir.1990)).[20] Beekley does not have that evidence. As I

---

**20.** On its damages claim, Beekley must show actual confusion. On its injunctive relief claim, it must show that Beekley's actions "are likely to cause confusion or to deceive

state in the trademark infringement analysis below, the consumer audience here is highly sophisticated, and employs significant research and sampling in its initial purchasing decisions. S.M.F. ¶¶ 47, 63–64. A target audience's special knowledge of a class of products is highly relevant to any claim that it was misled by an advertisement for such a product. *Sandoz*, 902 F.2d at 229–30. There is no likely confusion here.

### C. Trademark Infringement (Fifth Counterclaim) [21]

Solstice sells a two-tone[22] pink skin marker for mammography. It calls it the M15S BB Marker (1.5 mm in size). S.M.F. ¶ 42. In its Fifth Counterclaim, Beekley alleges that the M15S infringes Beekley's U.S. Trademark Registration No. 2,708,429 of the color pink for skin

markers ("the '429 registration"). The Color Pink Trademark Reg. No. 2,708,429 (Docket Item 110–22) attached as Ex. U to Pls.' Statement of Facts. That trademark registration states:

> The mark consists of the color pink applied to the front face of a pressure-sensitive adhesive backing used for attaching the marker to a patient's skin and forming a part of the goods, and to pink illustrations and representations of the markers applied to the packaging for the goods. The pressure-sensitive adhesive backings bearing the mark take different geometric shapes, and the shapes and borders of the color pink, and the outline of the portion of the goods to which the mark is applied are illustrated in broken lines in the drawing, and do not form part of the mark.

*Id.*[23] This Beekley trademark is for "identi-

---

customers." *Cashmere*, 284 F.3d at 311 & n. 9.

21. Beekley brought its counterclaim entitled "trademark infringement" under 15 U.S.C. § 1125(a) (unfair competition), rather than 15 U.S.C. § 1114(1) (infringement of federal trademark). *See Int'l Ass'n of Machinists & Aerospace Workers, AFL–CIO v. Winship Green Nursing Ctr.*, 103 F.3d 196, 200 n. 5 (1st Cir.1996). Although § 1125(a) is somewhat broader than § 1114(1) because it covers common law trademark and trade dress infringement, both causes of action are similar, and often the same set of facts will support both. *See Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 258–59 (5th Cir.1980). Beekley does not address this issue and Solstice does not assert that it has suffered any prejudice as a result of the way Beekley has pleaded this claim. The choice of statutory section does not affect my analysis of the trademark infringement claim.

22. Solstice describes the M15S marker as half red and half pink. Pls.' Mot. For Summ. J. at 13. Beekley disagrees and says that it is two shades of "Pantone Pink 191." Def.'s Opp'n to Mot. For Summ. J. at 28 (relying on the technical specifications of the M15S marker). Since Solstice seeks summary judgment of no

trademark infringement, I view the facts in the light most favorable to Beekley, *i.e.*, the two shades of "Pantone pink 191." I also note that the "red" color of the M15S marker supplied in the exhibit actually appears closer to mauve.

23. Beekley now also asserts a claim for infringement of its common law mark "X–Spot." It made no such claim in its counterclaim for trademark infringement, Am. Answer and Countercls. ¶¶ 28–32. Solstice first received notice of the new counterclaim concerning Beekley's "X–Spot" trademark ten days before the close of fact discovery when Beekley served amended responses to the plaintiffs' second set of interrogatories. Def.'s Second Am. Objections and Resp. to Pls.' Second Set of Interrogs. (Nos. 12–26) at 10–13 (Docket Item 110–25) attached as Ex. X to Pls.' Statement of Undisputed Facts. Beekley has never moved to amend its counterclaim under Fed.R.Civ.P. 15. Without properly amending its counterclaim, Beekley cannot enlarge the scope of the trademark infringement claim by simply including a new claim of infringement in the supplemental responses to its interrogatory responses, even if those responses were served before the close of discovery. Beekley's X–Spot trademark claim is not properly in this case.

fication markers placed on the skin for use in medical imaging, in class 10." [24] *Id.* Since Beekley has registered the color pink for its identification markers, the mark is entitled to a presumption of validity as a federally registered trademark. 15 U.S.C. § 1057(b).

"To succeed on a claim of trademark infringement, a plaintiff must establish (1) that its mark is entitled to trademark protection, and (2) that the allegedly infringing use is likely to cause consumer confusion." *Boston Duck Tours, LP v. Super Duck Tours, LLC,* 531 F.3d 1, 12 (1st Cir.2008). Solstice moves for summary judgment on Beekley's trademark infringement claim. Solstice asserts that (1) Beekley cannot trademark the color pink, and (2) Beekley cannot establish a likelihood of confusion.

### (1) Protectability

On the first requirement, it is well established that colors can be entitled to trademark protection. *Qualitex Co. v. Jacobson Prods. Co., Inc.,* 514 U.S. 159, 166, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995) (finding color can meet requirements for trademark when it serves no function other than to distinguish a firm's goods and identify their source). But this protection is subject to eight defects or defenses enumerated in 15 U.S.C. § 1115(b) and a separate defect of genericism, 15 U.S.C. § 1064(3). With respect to Beekley's trademark claim of the color pink, Solstice asserts functionality and genericism (Solstice says that the mark is "debilitatingly weak" or "essentially ... generic") as objections to protectability. Pls.' Mot. For Summ. J. at 32, 33.

### (a) Functionality

The functionality defense prevents manufacturers from monopolizing useful product features under the guise of trademark law. *Qualitex,* 514 U.S. at 164–65, 115 S.Ct. 1300. A product feature is functional and cannot serve as a trademark "if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *Id.* at 165, 115 S.Ct. 1300 (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.,* 456 U.S. 844, 850, n. 10, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982)). In cases of aesthetic functionality, courts consider whether "exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage." *TrafFix Devices Inc. v. Marketing Displays Inc.,* 532 U.S. 23, 32, 121 S.Ct. 1255, 149 L.Ed.2d 164 (2001) (quoting *Qualitex,* 514 U.S. at 165, 115 S.Ct. 1300). However, the feature need not be a competitive necessity. *TrafFix,* 532 U.S. at 32–33, 121 S.Ct. 1255.

Solstice asserts that the color pink is functional and thus not entitled to trademark protection. Beekley's pink skin markers, Solstice contends, serve "the utilitarian purpose of blending well with the natural color of human skin." Pls.' Mot. For Summ. J. at 33. Although skin markers need not blend with skin to perform all their utilitarian functions, Solstice claims that discreetly colored medical products serve a function that more colorful ones do not. To support this argument Solstice relies on *In re Ferris Corp.,* 59 U.S.P.Q.2d 1587, 1588 (Oct. 6, 2000), where a trademark application was filed to register the color pink for, *inter alia,* "surgical and post-surgical wound dressings." In *Ferris,* the Examining Attorney, comparing surgical wound dressings to adhesive

---

**24.** "Class 10" denotes medical apparatus and includes mainly medical apparatus, instru-

ments and articles.

bandages, concluded that the color pink is "de jure functional" because it is compatible with caucasian skin tones. *Id.* The Trademark Trial and Appeal Board agreed. *Id.* at 1592.

I cannot conclude on the summary judgment that Beekley's mark is functional. Blending mammography markers with patients' skin has not been a goal or consideration in Beekley's design. S.A.F. ¶ 97. In fact, the color pink is not visible on a mammogram and plays no role in the functioning of the marker. S.A.F. ¶ 100. Unlike the pink bandages in *Ferris,* imaging markers are applied only temporarily to the skin of a breast during a mammogram. S.A.F. ¶ 98. Dr. DeSena states in a conclusory manner that "the fact that [the color pink marker] blends in with the skin color is perhaps comforting to the patient." DeSena Dep. at 73–74; S.M.F ¶ 44. But there is no showing that Beekley's color pink markers blend with *any* skin color.

Further, there is no evidence in the record that any of Beekley's competitors use the color pink for blending purposes. To the contrary, the evidence shows that competitors do not use the color pink, or any other color, for the purpose of blending mammography markers with the skin. S.A.F. ¶ 99.[25] *See In re Owens–Corning Fiberglas Corp.,* 774 F.2d 1116, 1121 (Fed. Cir.1985) ("[W]here a variety of color designs has been utilized by other producers, courts have viewed this as evidence that such design features are primarily nonfunctional in nature."). For example, competitor St. John uses bold animal prints and other colored designs on its markers, and competitor Suremark has long used a blue pattern on its markers. S.A.F. ¶ 99. I conclude that Solstice has not shown that a jury would have to find that Beekley's mark for the color pink is functional.

### (b) Genericism

The presumption of federal trademark validity may be overcome if a challenger proves, by a preponderance of the evidence, that a mark has become generic. *Colt Defense LLC v. Bushmaster Firearms, Inc.,* 486 F.3d 701, 705 (1st Cir. 2007). When, in the public's mind, a trademark stops identifying the particular source of a product and instead identifies a class of product or service, regardless of source, that mark has become generic and is lost as an enforceable trademark. *See* 15 U.S.C. § 1064(3). Solstice asserts that the color pink has become a generic indicator for goods or services in the field of breast cancer research, awareness, detection, and treatment. The color pink, Solstice claims, is pervasive among goods and services associated with breast cancer or women's health issues. On this record, I find that Solstice does not present sufficient evidence to establish that a jury would have to find that the color pink has become generic.

In order to establish that pink has become generic, Solstice must (1) identify the class of products to which it applies; (2) identify the relevant purchasing public; and (3) prove that the primary significance of pink to the relevant public is to identify the class of products to which it applies *Colt Defense LLC v. Bushmaster Firearms, Inc.,* 2005 WL 2293909, at *20 (D.Me.2005) (*quoting Glover v. Ampak, Inc.,* 74 F.3d 57, 59 (4th Cir.1996)). To become generic, pink's primary significance must be its indication of the nature or class of the product or service, rather than an indication of source. *See Freecycle Network, Inc. v. Oey,* 505 F.3d 898, 905 (9th Cir.2007); *Creative Gifts, Inc. v. UFO,* 235 F.3d 540, 544 (10th Cir.2000);

---

**25.** St. John has one marker that has pink breast-cancer ribbons on a neutral background. *See* Spee–D–Mark Mammography Markers, Marker SDG–RSS612 (Ex. DD to S.M.F.) (Docket Item 110–32).

*Helene Curtis Industries v. Church & Dwight Co.,* 560 F.2d 1325, 1332 (7th Cir. 1977); *King–Seeley Thermos Co. v. Aladdin Indus., Inc.,* 321 F.2d 577, 580 (2d Cir.1963). Only by showing that the public understands by the mark the class of goods or services of which the trademarked product or service is a part can the party carry its burden. The issue of whether a mark is generic is a question of fact. *Borinquen Biscuit Corp. v. M.V. Trading Corp.,* 443 F.3d 112, 118 (1st Cir. 2006).

Although Solstice asserts that the class of products here is goods and services whose purchase will either support a breast-cancer-related non-profit organization or be used in connection with breast cancer detection or treatment, the relevant class of goods and services is identified in the mark's certificate of registration. *See Magic Wand, Inc. v. RDB, Inc.,* 940 F.2d 638, 640 (Fed.Cir.1991) (citing *Octocom Sys., Inc. v. Houston Computer Servs., Inc.,* 918 F.2d 937, 942 (Fed.Cir.1990)). Here, that is "identification markers placed on the skin for use in medical imaging." The Color Pink Trademark Reg. No. 2,708,429. Thus, in order to prove that pink has become generic, Solstice must establish that the primary significance of the color pink, when applied to mammography-related identification markers for skin, is to identify that class of products, rather than Beekley as a source. Solstice alleges that "the color pink has essentially become a generic indicator" because "many companies own trademarks that use the color pink or the word 'pink' to identify goods or services concerning breast cancer specifically or female health issues generally." Pls. Mot. for Summ. J.

at 25–26. Although Solstice offers examples of many uses of pink in connection with breast cancer treatment, prevention and related activities, Solstice has offered no evidence that consumers have come to view pink as a generic indicator that goods or services marked with that color are related to those activities, or that imaging markers of that color would be seen as necessarily mammography-related.[26] Proof that a mark has become an indicator of a class of product or service (breast-cancer related) and not its source (Beekley) requires more than the subjective view of a casual purchaser; there must be evidence that the generic reference has become the mark's primary significance to members of the "relevant public." *See* 15 U.S.C. § 1064(3); *Magic Wand,* 940 F.2d at 641.

Solstice has not presented evidence that would require a jury to find that pink has become a generic mark with respect to breast treatment activities.

### (2) Likelihood of Confusion

■ Because a jury could find Beekley's trademark of pink a protectable trademark, I turn to the second requirement, likelihood of confusion, an essential element of trademark infringement. 15 U.S.C. § 1114(1); *Boston Duck Tours,* 531 F.3d at 12 (under § 1114(1)); *Astra Pharm. Prods., Inc. v. Beckman Instruments, Inc.,* 718 F.2d 1201, 1209 (1st Cir. 1983) (under § 1125(a)). Likelihood of confusion means "more than a theoretical possibility of confusion." *Boston Duck Tours,* 531 F.3d at 12 (quoting *Int'l Ass'n of Machinists and Aerospace Workers, AFL–CIO v. Winship Green Nursing Ctr.,*

---

**26.** Contrary to Solstice's argument, neither of the two nearest mammography imaging marker competitors, St. John and Suremark, refers to the color pink to denote any of their products, S.A.F. ¶ 99., with the possible exception of St. John's SDG–RSS612 Marker,

*see* note 25 *supra.* *Hasbro Inc. v. MGA Entm't,* 497 F. Supp 2d 337, 345 (D.R.I.2007) (the volume of evidence of competitors' use of the mark to describe the goods at issue is a particularly significant indication of the public's understanding of the term).

103 F.3d 196, 200 (1st Cir.1996)). The allegedly infringing conduct must create "a likelihood of confounding an appreciable number of reasonably prudent purchasers exercising ordinary care." *Id.* (quoting *Winship Green,* 103 F.3d at 201).

In the First Circuit, likelihood of confusion is assessed by considering eight factors set out in *Pignons S.A. de Mecanique de Precision v. Polaroid Corp.,* 657 F.2d 482, 487 (1st Cir.1981): "[1] the similarity of the marks; [2] the similarity of the goods; [3] the relationship between the parties' channels of trade; [4] the relationship between the parties' advertising; [5] the classes of prospective purchasers; [6] evidence of actual confusion; [7] the defendant's intent in adopting its mark; and [8] the strength of the plaintiff's mark." But in the final analysis, the issue is likelihood of confusion. No single factor is determinative. *Astra,* 718 F.2d at 1205. In addition, "any other factor that has a tendency to influence the impression conveyed to prospective purchasers by the allegedly infringing conduct may be weighed by the judge or jury in gauging the likelihood of confusion." *Winship Green,* 103 F.3d at 201.

I proceed to analyze the eight enumerated factors. This is a factual inquiry, but "summary judgment is appropriate if, taking the facts before the court and all reasonable inferences therefrom most favorably to [the mark's owner], no reasonable jury could find [in its favor]." *CMM Cable Rep., Inc. v. Ocean Coast Properties, Inc.,* 888 F.Supp. 192 (D.Me.1995) (citing *Astra,* 718 F.2d at 1204–09 (1st Cir.1983)); *see also Xtreme Lashes, LLC v. Xtended Beauty, Inc.,* 576 F.3d 221, 227 (5th Cir. 2009).

**27.** *See supra* note 22.

### (a) Similarity of the Marks

 When comparing marks, "similarity is determined on the basis of the total effect of the designation, rather than a comparison of individual features." *Boston Duck Tours,* 531 F.3d at 29 (quoting *Pignons,* 657 F.2d at 487); *Recot, Inc. v. M.C. Becton,* 214 F.3d 1322, 1329 (Fed.Cir. 2000). The degree of similarity between two marks is determined by analyzing their sight, sound, and meaning. *Id.* at 24. Under certain circumstances, otherwise "similar marks are not likely to be confused if they are used in conjunction with clearly displayed names, logos or other source-identifying designations of the manufacturer." *Winship Green,* 103 F.3d at 204; *Astra,* 718 F.2d at 1205.

The trademark of Beekley's '429 registration "consists of the color pink applied to the front face of a pressure-sensitive adhesive backing used for attaching the marker to a patient's skin and forming a part of the goods...." The Color Pink Trademark Reg. No. 2,708,429. The particular pink color is not specified. The mark has no particular shape. *Id.* Thus, it is somewhat difficult to "compare the marks." The record does contain a number of Beekley product samples that contain the color pink to a greater or lesser degree.

 In 2005, Solstice introduced the M15S nipple marker. S.M.F. ¶ 42. Solstice's M15S marker bears a two-tone pink color[27] applied to the front face of a pressure-sensitive adhesive backing used for attaching the marker to a patient's skin. The M15S consists of a darker pink portion in the shape of a semi-circle, and a lighter pink portion in the shape of a rectangle. None of the Beekley product exemplars in the record is the same shape. The rectangular portion of the Solstice

product also clearly bears Solstice's own federally registered and incontestable trademark, Xact®. S.M.F. ¶ 43; S.A.F. ¶ 43 (not denying that the Solstice product bears the Solstice trademark).

A reasonable jury would have to find that the total effect of the appearance of Solstice's M15S marker is very different from any Beekley use of pink that is in the record. Moreover, the pink portion of Solstice's two-tone, generally rectangular, M15S prominently displays Solstice's own trademark, Xact®. S.M.F. ¶ 43; *see Winship Green*, 103 F.3d at 204; *Astra*, 718 F.2d at 1205. The marks are not similar. Confusion is unlikely.

### (b) Similarity of the Goods

The goods in question here are very similar; both parties are selling skin identification markers that are placed on the skin of the breast for a mammography examination. This cuts in favor of likelihood of confusion.

### (c) The Relationship Between the Parties' Channels of Trade, Advertising and the Classes of Prospective Purchasers

The parties agree that they are direct competitors and that their channels of trade, advertising, and prospective purchasers for the products at issue overlap. Pls.' Mot. For Summ. J. at 9, 30; *see also* S.A.F. ¶ 116. Skin imaging marker customers and prospective customers are hospitals and imaging centers. S.M.F. ¶ 62. An initial decision to purchase skin markers typically involves multiple phone calls, product sampling, and feedback from technicians and radiologists. S.M.F. ¶¶ 47, 63–64. Thus, although there is a high degree of correlation between the parties' channels of trade and prospective purchasers, the sophisticated nature of skin marker purchasers coupled with the practice of sampling and testing the skin markers prior to making an initial purchasing decision,

makes confusion unlikely. *Star Indus., Inc. v. Bacardi & Co. Ltd.*, 412 F.3d 373, 390 (2d Cir.2005) ("The appropriate level of customer care and sophistication can be proven by inferences drawn by a judge based on the nature of the product or its price.").

### (d) Evidence of Actual Confusion

▮ Solstice has sold its M15S markers since 2005. Yet Beekley agrees that it has no evidence of any customer actually being confused. (It states that because of the number of M15S markers sold by Solstice, "there has been little chance for actual confusion." Def.'s Opp'n to Pls.' Mot. For Summ. J. at 27.) Although not essential to finding likelihood of confusion, evidence of actual confusion is "often deemed the best evidence of possible future confusion." *Boston Duck Tours*, 531 F.3d at 25 (quoting *Attrezzi, LLC v. Maytag Corp.*, 436 F.3d 32, 40 (1st Cir.2006)). In *Pignons* the court held that absent evidence of actual confusion, "when the marks have been in the same market, side by side, for a substantial period of time, there is a strong presumption that there is little likelihood of confusion." *Pignons*, 657 F.2d at 490. Thus, in the absence of evidence of actual confusion, there is a "strong presumption" in favor of Solstice that confusion is unlikely.

### (e) Solstice's Intent in Adopting Its Mark

Solstice contends that it had no wrongful intent when it began selling the M15S marker. Solstice explains that its skin markers are marketed in a variety of colors to differentiate part numbers, *e.g.*, "the smaller BB versus the larger BB." S.M.F. ¶ 41. Before marketing the M15S marker, Solstice states that there was no formal evaluation of the color pink; rather, Dr. DeSena thought it was "a good color for a mammography marker" because, for example, the color pink is "very prevalent" in

mammography and "the fact that it blends in with the skin color is perhaps comforting to the patient." S.M.F. ¶ 44. Dr. DeSena also considered whether a color is "easy to work with in terms of being a good graphic contrast with black ink." S.M.F. ¶ 44. When Solstice introduced the M15S marker, Dr. DeSena recalled only that Beekley had "a floral pattern" marker. S.M.F. ¶ 45. He says that he was not aware that Beekley had a registration for pink or that Beekley sued other competitors for trademark infringement. S.M.F. ¶ 46.

But Beekley asserts that Solstice copied its mammography marker when it designed its M15S marker. In May 1999, Solstice purchased two boxes of mammography "nipple" markers from Beekley. S.A.F. ¶ 118. One box (order code 110) contained Beekley's N–Spot markers, and the other box (order code 101) contained Beekley's X–Spot markers. S.A.F. ¶ 118. The first box of markers used Beekley's pink color for which registration issued in April 2003; the other box of markers included Beekley's X–Spot Mark and the markers were colored blue. S.A.F. ¶ 118. When Solstice entered the mammography marker field several years later, it introduced the M15S with the two-toned pink color. Beekley argues that this evidence supports a finding that Solstice copied the color pink trademark from the markers it purchased from Beekley.

I conclude that there are issues of fact as to what Solstice's intent was when introducing the M15S marker. On this summary judgment motion, I will assume that the jury would find this factor favorably to Beekley.

---

**28.** Solstice makes a "qualified" response to this Beekley assertion, but in the absence of any record evidence to oppose it, I take it as undisputed. D. Me. Local R. 56(f).

**29.** Solstice denies these Beekley assertions, but since Solstice provides no contrary evi-

### (f) Strength of the Mark

The "strength" of a mark denotes the mark's placement on the spectrum of distinctiveness. It ranges from "descriptive" of the product at issue (relatively weak) to "arbitrary" (relatively strong). *McCarthy on Trademarks and Unfair Competition* at § 11:83. Strength is an issue of fact. *Equine Techs., Inc. v. Equitechnology, Inc.*, 68 F.3d 542, 544, n. 2 (1st Cir.1995). "Various factors are relevant in ascertaining the strength of a trademark, including the length of time the mark has been used, the trademark holder's renown in the industry, the potency of the mark in the product field (as measured by the number of similar registered marks), and the trademark holder's efforts to promote and protect the mark." *Borinquen Biscuit Corp.*, 443 F.3d at 121 (internal citations omitted); *see also* Restatement (Third) of Unfair Competition § 21, cmt. i (1995) ("[s]uch classifications [of a term on the spectrum of distinctiveness] are not conclusive of 'strength,' however, since the issue ultimately depends on the degree to which the designation is associated by prospective purchasers with a particular source").

Beekley is the market leader in mammography skin markers. S.A.F. ¶ 47.[28] Both Beekley and Solstice offer skin markers in a variety of colors. S.M.F. ¶¶ 40, 50. Although Beekley's first mammography marker was blue, S.M.F. ¶ 51, Beekley has used and promoted its pink trademark extensively since 1992. S.A.F. ¶¶ 105, 106.[29] Beekley's two most significant competitors in mammography markers do not use the color pink on their markers. S.A.F. ¶ 99.[30] But the color pink is used by others in

---

dence, I take them as undisputed. D. Me. Local R. 56(f).

**30.** With the possible exception noted *supra* note 25.

connection with the fight against breast cancer. Beekley does not use the color pink consistently across its mammography product line; its mammography product line includes various colors as well as multicolor floral prints. S.M.F. ¶ 50.

On this record, Beekley's pink is at neither the descriptive nor the arbitrary end of the distinctiveness scale. I conclude that a factfinder could not find pink to be either a strong or a weak mark.[31]

### (g) Overall Likelihood of Confusion

■ In sum, the marks are not similar, Beekley's mark is not strong, the purchasers are sophisticated, they engage in careful scrutiny and testing before their initial purchase, and there is no evidence of confusion. All these factors demonstrate that the likelihood of confusion is nil. The arguably contrary factors—that Solstice may have had a bad motive, that the mark is not weak, and that the parties are compet-

ing in the same channels with similar products for sale—are not enough to create a factual issue over likelihood of confusion. Solstice is entitled to summary judgment that its M15S does not infringe Beekley's mark.

### D. Maine Uniform Deceptive Trade Practices Act ("UDTPA") (Seventh Counterclaim)

Beekley's Seventh Counterclaim alleges that Solstice has violated the Maine Deceptive Trade Practices Act by falsely advertising on its website that its mammography scar markers are covered by the '106 patent and by selling markers that use Beekley's trademarked color pink, which will confuse the relevant public. See 10 M.R.S.A. § 1213. Because of my ruling on the trademark infringement counterclaim based on the color pink mark, see supra Section C on trademark infringement, only the false patent marking claim remains.[32]

---

**31.** Beekley has presented limited evidence on whether prospective purchasers associate the color pink with Beekley products. Beekley's Vice President of Sales and Marketing affirms that she "understand[s] that the Color Pink Mark is recognized by consumers of mammography markers as identifying a source of consistent and superior quality," namely, Beekley. Flannery Aff. ¶ 16; see also ¶¶ 15, 21. The only support for that statement appears to be customer declarations that Beekley collected in 2002 and submitted to the U.S. Trademark Office to support its trademark application. See Amend. & Resp. to Office Action No. 1 (Docket Item 159); Amend. & Resp. to Office Action No. 2 (Docket Items 159–1, 160, 161).

**32.** In its response to Solstice's motion for summary judgment, Beekley asserts that its Maine UDTPA claim is based on all the claims in the fourth, fifth and sixth counterclaims, including: (1) publishing false advertisements indicating that Solstice's mammography markers are patented under the '106 patent; (2) promoting, selling, and distributing infringing markers bearing the color pink and X–Spot Marks; and (3) engaging in false and misleading advertising in connection with the

challenged statements including advertisements falsely referenced its: "Spots", "Spot", "Soft N Stretchy", and "Florals". Def.'s Opp'n to Pls.' Mot. For Summ. J. at 37. These additional bases for the Maine UDTPA claim were asserted for the first time in Beekley's late-filed supplemental response to interrogatory 10. Objection and Responses to Pls.' First Set of Interrogs. (No. 10) at 3–5 (Docket Item 164–1) attached as Ex. 31 to Swift Aff. Solstice first received notice of the additional bases on April 16, 2010, after the close of fact discovery and after Solstice filed its motion for summary judgment. Id.

Beekley's untimely attempt to amend its counterclaims via supplemental interrogatory responses served after the close of discovery violates Rule 15 and this Court's Scheduling Order regarding discovery. Scheduling Order at 2 (Docket Item 18). See Net 2 Press, Inc. v. 58 Dix Avenue Corp., 266 F.Supp.2d 146, 161 (D.Me.2003) (supplemental interrogatory responses "should not be allowed after the filing of dispositive motions and on the eve of trial in the absence of extraordinary circumstances"). Beekley's additional claims are not properly part of the Maine UDTPA count.

 Solstice claims that Beekley's Maine UDTPA claim is preempted.[33] Federal Circuit law controls whether a state law cause of action is preempted by federal patent law. *Dominant Semiconductors SDN. BHD. v. Osram GMBH*, 524 F.3d 1254, 1260 (Fed.Cir.2008). The Federal Circuit applies conflict preemption analysis to state unfair competition law. *Hunter Douglas, Inc. v. Harmonic Design, Inc.*, 153 F.3d 1318, 1335 (Fed.Cir.1998), *overruled in part on other grounds by Midwest Industries, Inc. v. Karavan Trailers, Inc.*, 175 F.3d 1356, 1358 (Fed.Cir.1999), (the question is whether the state unfair competition law frustrates "the accomplishment and execution of the full purposes and objectives of Congress.").

In that connection, the Federal Circuit has held that a false patent marking claim can proceed under state unfair competition law if, but only if, the claim alleges bad faith[34] and the evidence supports it. *Hunter Douglas*, 153 F.3d at 1336; *see also Zenith Electronics Corp. v. Exzec, Inc.*, 182 F.3d 1340, 1353 (Fed.Cir.1999) (adopting the bad-faith requirement for conflict between federal patent and federal trademark claims). That is so regardless of whether the state law itself requires bad faith. *Hunter Douglas*, 153 F.3d at 1336–37; *Zenith*, 182 F.3d at 1353–54. The Maine UDTPA does not require intent to deceive. 10 M.R.S.A § 1213 ("Proof of . . . intent to deceive is not required.") Nevertheless, "to impose state tort liability against a patentee for publicizing its patent, bad faith in publication of the patent *must* be established to avoid preemption by patent law, regardless of whether the state cause of action otherwise requires bad faith." *Id.* at 1353–54 (emphasis added). Thus, the Maine UDTPA claim for false patent marking survives preemption by federal patent law only if Beekley establishes that Solstice placed the '106 patent on its scar marker advertisements in bad faith. I have already found that there are issues of fact on this record as to whether Solstice acted with intent to deceive (which certainly could be bad faith) when it referred to the '106 patent in its webpage advertising scar markers. Therefore, · the claim is not necessarily preempted.

However, I conclude that Beekley's UDTPA claim cannot survive because there is no case or controversy. The UDTPA is limited to equitable relief; no damages can be awarded. *See* 10 M.R.S.A. § 1213; *J.S. McCarthy Co., Inc. v. Brausse Diecutting & Converting*, 340 F.Supp.2d 54 (D.Me.2004). Here, the record shows that DeSena removed the offending website reference approximately one month after the counterclaim was filed. *Compare* Answer and Countercls. (Docket Item 15) filed on Sept. 3, 2009 *with* Solstice Scar Marker internet webpage dated Oct. 6, 2009 (Docket Item 110–16) attached as Ex. O to Pls.' Statement of

---

**33.** Beekley argues that Solstice waived its preemption defense. Solstice's Answer to Amended Counterclaims included an affirmative defense under Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief could be granted. (Docket Item 44 at 9) Although Solstice's Answer did not specifically mention a preemption defense, it did contain a broader Rule 12(b)(6) defense that was capable of encompassing preemption. *Williams v. Ashland Eng'g Co., Inc.*, 45 F.3d 588, 593 (1st Cir.1995), *overruled on other grounds by Carpenters Local Union No. 26 v.*

*U.S. Fid. & Guar. Co.*, 215 F.3d 136 (1st Cir.2000) ("Here, although [the] answer did not specifically mention a preemption defense, it did contain a broader Rule 12(b)(6) defense that was capable of encompassing preemption."); *McCoy*, 950 F.2d at 22–23 (upholding preemption-based dismissal pursuant to Rule 12(b)(6)).

**34.** Beekley incorporated its allegations regarding Solstice's intent to deceive into its Maine UDTPA claim. *See* Am. Answer and Countercls. ¶¶ 25, 50.

Undisputed Facts. Alone, that action by Solstice might not be enough to destroy case or controversy, but here Solstice has gone farther and has explicitly admitted that the '106 patent does not cover the Solstice scar markers. *See* Pls.' Mot. For Summ. J. at 21–22 ("Solstice acknowledges that its mammography scar markers are not covered by the '106 patent. Solstice also admits that the '106 patent was referenced on Solstice's website, www.solsticecorp.com, near an image of and information about Solstice's mammography scar markers.") (citations omitted); S.M.F. ¶ 37; S.A.F. ¶ 41; DeSena Dep. at 176. Thus, there remains no controversy between the parties about the propriety of treating the Solstice Scar Markers as covered by the '106 patent, nothing to enjoin and no substantive relief available under the Maine statute.[35]

### Beekley's Damages Experts

Solstice's motion to exclude the testimony of Beekley's Martha Flannery is Moot. Beekley offers Flannery, its Vice President of Sales and Marketing, only on Solstice's damages case, to testify what would be a reasonable royalty, and I have granted summary judgment to Beekley on Solstice's infringement claim. If it were not moot, I would deny the motion. The arguments Solstice raises go to the weight of the evidence.

Solstice's motion to exclude the testimony of Beekley's Olga Glynos is Denied. Beekley offers her testimony on its damages case against Solstice. Glynos is Beekley's Finance and Technology Manager, and can testify about Beekley's lost profits and what Beekley would charge for a license.

Both experts are qualified to give the testimony they propose to offer. The role of counsel in preparing their reports is not enough to exclude their testimony, but can certainly be used in cross-examination. The experts' testimony may not be sufficient on the damage issues, but it is relevant.

### Conclusion

The defendant's motion for summary judgment on the complaint is Granted. The plaintiffs' motion for summary judgment on the complaint is Denied. The plaintiffs' motion to exclude experts is Moot in Part and Denied in part. The parties' motions for claims construction are Granted in part and Denied in part. The plaintiffs' motion for summary judgment on the counterclaims is Granted in part and Denied in part.

What remains for trial are:

1. Infringement of the '461 patent by the doctrine of equivalents.

2. False patent marking of the '106 patent on Solstice's website under 35 U.S.C. § 292.

So Ordered.

---

**35.** *See, e.g., Overseas Military Sales Corp. v. Giralt–Armada,* 503 F.3d 12, 14 (1st Cir.2007) ("In light of [a party's] concession, this case has become moot."). Even when no party raises the issue, as here, a court must address it because it is jurisdictional and derives from Article III's restriction of federal court jurisdiction to actual cases and controversies. *Id.* at 16–17.